UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ X
```

KIM NEWSOME and MITCHELL PROUX, :
 :
     Plaintiffs, :
 :
   -against- :
 :
IDB CAPITAL CORPORATION and IDB :
BANK d/b/a Israel Discount Bank of New York, :
 :
     Defendants. :

```
------------------------------------------------------------ X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  3/28/2016

13-CV-6576 (VEC)

MEMORANDUM
OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

   Plaintiffs Kim Newsome and Mitchell Proux are African-American, non-Jewish men who allege that the Defendants harassed, discriminated against, retaliated against, and ultimately fired them based on their race, color, ethnicity, gender, and religion, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991 ("Section 1981"); the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.* Defendants have moved for summary judgment, separately as to each Plaintiff, on all claims. Because neither Plaintiff has established that he was discriminated or retaliated against, Defendants' motions are GRANTED as to all but Plaintiffs' claims under NYCHRL, which are dismissed for lack of subject matter jurisdiction. The case is DISMISSED.

# BACKGROUND[1]

Defendant IDB Bank d/b/a Israel Discount Bank of New York ("IDBNY" or the "Bank") is a banking institution headquartered in New York City.[2]  Both Proux and Newsome had relatively short and unsuccessful tenures as employees of IDBNY.

## I.   Plaintiff Mitchell Proux

In August 2010, Proux was hired as Assistant Vice President in the Bank's Credit Administration Division.  Defs. Proux 56.1 Stmt. ¶ 14; Proux 56.1 Resp. ¶ 14.  During his first year of employment, Proux reported directly to Eugene Cartin, the former head of the Bank's Credit Administration Division.  Proux 56.1 Resp. ¶ 18; Proux Dep. (Dkt. 55-4) at 55.  In 2010, Proux received a satisfactory evaluation of "Meets Expectations" from Cartin.  Defs. Proux 56.1 Stmt. ¶ 19; Proux 56.1 Resp. ¶ 19.[3]

Upon Cartin's termination in late Spring 2011 and while the Bank searched for his permanent replacement, Mary Beth Sweeney served as the interim head of the Credit Administration Division and directly supervised Proux.  Defs. Proux 56.1 Stmt. ¶¶ 20-21; Proux 56.1 Resp. ¶¶ 20-21.  Sweeney was apparently a tough manager and, during that time, Proux, as well as four other employees, complained about her to Human Resources.  Defs. Proux 56.1

---

[1]      The parties' Local Rule 56.1 Statements are referenced as follows: "Defs. Proux 56.1 Stmt.," "Defs. Newsome 56.1 Stmt.," "Proux 56.1 Resp.," "Newsome 56.1 Resp." "Proux 56.1 Stmt.," "Newsome 56.1 Stmt.," "Defs. Proux 56.1 Resp.," and "Defs. Newsome 56.1 Resp."  The Court refers to the parties' briefing on their motions for summary judgment as "Defs. Proux Mem.," "Proux Opp'n," "Defs. Proux Reply," "Defs. Newsome Mem.," "Newsome Opp'n," and "Newsome Reply."

[2]      Defendant IDB Capital Corp. is IDBNY's broker dealer subsidiary.  Although IDB Capital Corp. is named as a Defendant, Plaintiffs do not dispute that they were never employed by IDB Capital Corp., Proux 56.1 Resp. ¶ 5 (Plaintiff's response is blank); Newsome 56.1 Resp. ¶ 6 ("Undisputed").

[3]      "Meets Expectations" was one of four performance ratings (scaled in order of "Below Expectations," "Meets Expectations," "Exceeds Expectations," and "Exceptional").  Stoler Proux Decl. (Dkt. 55) Ex. K.  The parties dispute whether Cartin ever expressed frustration with the quality of Proux's work.  *See* Proux 56.1 Resp. ¶ 19; Proux Opp'n at 1 n.2.

Stmt. ¶ 22; Proux 56.1 Resp. ¶ 22; Proux Dep. 61-65.  Proux's complaints were that Sweeney called him derogatory names including "jackass," "stupid," "idiot," "retard," and "loser."  Defs. Proux 56.1 Stmt. ¶ 23; Proux 56.1 Resp. ¶ 23; Proux Dep. 63, 85-89.

The four other individuals who complained to Human Resources about Sweeney have diverse demographics: one is an Hispanic, Christian male; one is an Hispanic female; one is a white, Christian male; and one is a white, Jewish male.  Defs. Proux 56.1 Stmt. ¶ 26; Proux 56.1 Resp. ¶ 26.  It is undisputed that Sweeney allegedly treated (or mistreated) all five employees similarly.  Defs. Proux 56.1 Stmt. ¶¶ 28-31; Proux 56.1 Resp. ¶¶ 28-31.[4]

Kathleen Bereswill became the new head of the Credit Administration Division in July 2011.  Defs. Proux 56.1 Stmt. ¶ 32; Proux 56.1 Resp. ¶ 32.  For approximately two months, Proux worked with Bereswill, who was not satisfied with the quality of his work.  Defs. Proux 56.1 Stmt. ¶¶ 37-41; Bereswill Dep. (Dkt. 55-5) at 34-35; Bereswill Decl. (Dkt. 57) ¶¶ 8-10.

In fall 2011, IDBNY created a new "Centralized Reporting function."  Defs. Proux 56.1 Stmt. ¶ 42; Proux 56.1 Resp. ¶ 42.  At Sweeney's request, Proux was transferred to an analyst position in "Centralized Reporting" and, once again, reported directly to Sweeney.  Defs. Proux 56.1 Stmt. ¶¶ 43, 45; Proux 56.1 Resp. ¶¶ 43, 45.  Sweeney believed Proux possessed the skills and knowledge required of the position and that it would be "a good opportunity for him to be seen and get exposure to [] other areas" of the Bank.  Defs. Proux 56.1 Stmt. ¶¶ 43-44; Sweeney Dep. 57-58; *see also* Bereswill Decl. Ex. A (Memorandum dated October 6, 2011 from Bereswill to Human Resources naming Proux to the Reporting Analyst position).  Proux, on the other hand, was unhappy with the transfer and saw it as part of a scheme by Sweeney to retaliate against him

---

[4]     Proux believes that he was singled out and verbally berated more frequently than his co-workers, Proux Opp'n at 2; Proux Dep. 119:18-120:16, 209:22-210:4, but also testified that all of the employees were verbally abused, Proux Dep. 65-69.

for his and his direct reports having complained about her to Human Resources.  Proux Dep. 128:20-129:4.

Proux was in Centralized Reporting for less than one month.  Defs. Proux 56.1 Stmt. ¶ 48; Proux 56.1 Resp. ¶ 48.  According to Sweeney, Proux failed to complete projects on time, and she was dissatisfied with his work.  Sweeney Dep. 68-71.  Proux does not contest that was Sweeney's evaluation, but he excuses his own performance by complaining about his high workload and by accusing Sweeney of sabotaging his performance.  Proux Dep. 126:24-128:2, 209:5-13.

Their relationship hit a low point on October 31, 2011, when, according to Proux, Sweeney referred to him as "stupid," and Proux responded by leaving the office, apparently before 5:00 p.m. and before the end of the work-day.  Defs. Proux 56.1 Stmt. ¶¶ 50-54; Proux 56.1 Resp. ¶¶ 50-54; *see also* Stoler Proux Decl. Ex. L at 2 (Email from Sweeney to Proux time-stamped 4:52 p.m. asking "Where are you?").[5]   In a contemporaneous email to Sweeney, Proux wrote:  "I did not leave . . . I was forced out by your lack of professionalism.  You referred to me as "Stupid" on four occasions today in your office.  I did not stay passed [sic] 5pm (as I normally do) because I don't feel like I have done anything to deserve further verbal abuse!"  Stoler Proux Decl. Ex. L.[6]

Proux contends that he reported the incident to David Cohen, the Bank's Chief Operating Officer and Sweeney's boss, and advised him that Sweeney's conduct was unprofessional and discriminatory because "[t]here's no reason I should be being spoken to that way."  Proux Dep.

---

[5]     Proux stated that he completed the report that he was working on before leaving the office.  Proux 56.1 Resp. ¶¶ 54-55.  Sweeney, however, testified that Proux left work before satisfactorily completing the report on which he was working.  Defs. Proux 56.1 Stmt. ¶¶ 54-55.

[6]     Although Proux took exception to what Sweeney said, Sweeney testified that she told Proux he was *not* stupid so she could not understand why he could not get the assignment done.  Sweeney Dep. 69-70.

87:14-92:4; *see also* Defs. Proux 56.1 Stmt. ¶ 59.[7]  According to Proux, he also spoke to Human

Resources after the incident and discussed "[d]iscrimination, specifically . . . that [Sweeney] is

completely out of control, she's harassing me, she's abusive towards me and she's discriminating

in many ways," although during his deposition he could not recall giving Human Resources any

specific examples of discrimination.  Proux Dep. 96:6-97:21.

       Sweeney viewed Proux's action of leaving early on October 31 to be insubordination

warranting immediate termination.  Sweeney Dep. 71:24-74:18.  She told Human Resources, "I

have a serious problem with Mitchell Proux and we need to terminate him.  He has been nothing

but an absolute problem . . . I don't even want him to be able to work tomorrow."  Stoler Proux

Decl. Ex. M.  Human Resources declined to terminate him and advised that more formal

documentation was needed in order to take any personnel action.  Sweeney Dep. 73:22-74:18;

*but see* Stonitsch Dep. (Dkt. 63-8) at 119:12-14 (Human Resources employee cannot recall the

reason Proux was not immediately terminated).  Sweeney provided Human Resources fourteen

specifications of Proux's performance deficiencies and cited input from two department heads.

Stoler Proux Decl. Ex. N; *see also* Bereswill Decl. Ex. B (email communications in which

Bereswill contributes to Sweeney's review of Proux); Defs. Proux 56.1 Stmt. ¶ 58; Proux 56.1

Resp. ¶ 58.

       The Bank did not terminate Proux but did transfer him, at his request, back to the Credit

Administration Division.  Proux Dep. 132:11-133:4.  Proux resumed his prior job title and pay,

Defs. Proux 56.1 Stmt. ¶ 63; Bereswill Decl. ¶ 17; *but see* Proux 56.1 Resp. ¶ 63 (asserting that,

in effect, he was demoted), and began to report to Eileen Healy, who had been recently promoted

---

[7]     Proux testified that he was referring to "the history of comments" that Sweeney had made to him, including "jackass," "idiot," and "stupid."  Proux Dep. 87:14-92:4.

to Vice President in that department.  Healy reported to Bereswill, who was the head of the department.  Defs. Proux 56.1 Stmt. ¶¶ 64-66; Proux 56.1 Resp. ¶¶ 64-66.

Bereswill and Healy almost immediately began having issues with Proux's performance after his return to the Credit Administration Division.  Bereswill Decl. ¶¶ 16-18.  On November 22, 2011, Bereswill orally warned Proux regarding an issue with the tracking of credit and loan documents that had occurred during Proux's prior tenure in the Credit Administration Division (the "Verbal Warning").  Bereswill Decl. ¶¶ 18-21, Ex. C (Nov. 22, 2011 Memorandum to file regarding Verbal Warning to Proux); Proux Decl. ¶¶ 11-14.[8]  Proux contends that no other employee who worked on the project was reprimanded.  Proux Opp'n at 15 (citing Proux Decl.

---

[8]      Bereswill and Proux disagree about Proux's level of responsibility for this project.  According to Bereswill, Proux was responsible for overseeing the tracking of all credit documents during his previous tenure and for ensuring the accuracy of the reported information.  Bereswill testified that Healy spent months reviewing and correcting errors in Proux's work.  Bereswill Decl. ¶¶ 18-21; *see also* Defs. Proux 56.1 Stmt. ¶¶ 68-70.  According to Bereswill, Proux was overseeing the project and, as an Assistant Vice President, was responsible for the work of his direct reports.  Bereswill Dep. 100-115; *see also* Bereswill Decl. Ex. C.

Proux denies responsibility for the poorly performed project, Proux 56.1 Resp. ¶¶ 68-70, and asserts that many employees worked on it, Proux Decl. ¶¶ 6, 11-13.  Proux contends that Sweeney directed him and others on how to enter information into the log and the spreadsheet.  Proux Decl. ¶ 8.  Moreover, he asserts that Sweeney and Bereswill testified that he had done a satisfactory job.  Proux 56.1 Resp. ¶ 68 (citing Sweeney Dep. 33:6-35:21 (testifying that Proux "did an excellent job on the doc checklist . . . It was a complicated project.  A lot of detail"); Bereswill Dep. 44:8-23 (testifying that Proux did a satisfactory job creating a log for documents being signed in and out of a document "vault")).  He also complained that, although he worked with the rest of the department to make Bereswill's requested corrections, Bereswill did not authorize him to use resources to get the job done that he believes she ultimately provided to Healy.  Proux Decl. ¶ 14.

Proux's citations to Sweeney's and Bereswill's depositions do not support his contention that he did a satisfactory job on the document tracking project.  The testimony of Bereswill that he cites regards a different project.  *Compare* Bereswill Dep. 44 (testifying that Proux created a "log for the vault"—"[f]or the documents going to imaging.  I believe there was a sign in and sign out at the vault, but there was no listing of documents that had been sent to another area, and then an understanding of the receipt of them coming back" and Proux "satisfactorily" created the log in a day) *with id.* 105-115 (describing an expansive document tracking project for all credit documents using Loan IQ, a system that maintains the Bank's loan portfolio and which contains a subset tracking module where certain documents are attached to specific transactions).  The portion of Sweeney's testimony cited by Proux regards her recollection of the project at its inception, when she was acting as interim head of the Credit Administration Division after Cartin left but before the Bank hired Bereswill as the new head.  Sweeney recalled that the project was complicated and that Proux had done a good job on the project initially, Sweeney Dep. 28-35, but by the time Bereswill orally reprimanded Proux, Sweeney was no longer interim head of the department.

¶¶ 6, 11-13).[9]

The same day he received the Verbal Warning, Proux met with Human Resources. At that meeting, Proux was provided feedback regarding his developmental needs, including the need to improve his ability to multitask. Human Resources also counselled him regarding his need to inform managers when he planned on being out of the office for extended periods. Stoler Proux Decl. Ex. O.

According to the Bank, despite counselling, Proux's performance did not improve, leading the Bank to give him a written warning (the "Written Warning") and to place him on a performance improvement plan ("PIP") in early December 2011. Defs. Proux 56.1 Stmt. ¶ 74; Proux 56.1 Resp. ¶ 74; Bereswill Decl. Ex D. The Bank identified two concerns with his performance: (1) Proux failed to follow instructions, Bereswill Decl. Ex. D; and (2) Proux made changes to loans in the Bank's Loan IQ system without following required protocol, *id.*; *see also* Defs. Proux 56.1 Stmt. ¶¶ 75-80. The PIP required Proux to meet with Healy (his manager) daily to discuss objectives for the day and to confirm with her any deviations from the agreed-upon objectives prior to deviating. Bereswill Decl. Ex. D. The PIP gave Proux 60 days to meet these requirements with the possibility of termination if he did not. *Id.*; Defs. Proux 56.1 Stmt. ¶ 82; Proux 56.1 Resp. ¶ 82.

According to the Bank, Proux's performance still did not improve, leading the Bank to give him a final written warning (the "Final Written Warning") in late January 2012. Defs. Proux 56.1 Stmt. ¶ 90; Proux 56.1 Resp. ¶ 90; Bereswill Decl. Ex. E. This warning again cited a

---

[9]     Proux identified Larry Spiegel, a white Jewish male, as having committed mistakes for which Bereswill blamed Proux. According to Proux, Spiegel was reprimanded alongside Proux for failing to complete UCC filings (an issue apparently unrelated to the document tracking project for which Proux was reprimanded), but he was not terminated or reprimanded the way Proux was and instead received a satisfactory evaluation and a bonus. Proux 56.1 Resp. ¶¶ 132-34. According to Bereswill, Spiegel's performance improved after he was reprimanded. *See* p. 29, *infra*.

number of performance issues, including that Proux failed to meet with Healy on a daily basis as the PIP required.  Bereswill Decl. Ex. E.  Along with the Final Written Warning, Proux received an updated PIP that again required him to meet with Healy each morning and to provide her with a log of his daily activities.  *Id.*  This PIP provided that he had thirty days to meet these requirements (until February 29, 2012), or he would face termination.  *Id.*

At the same time, Proux received his 2011 annual performance evaluation (the "Annual Performance Evaluation") that cited a host of performance issues and was signed by Healy and Bereswill.  Bereswill Decl. Ex. F; Defs. Proux 56.1 Stmt. ¶ 99; Proux 56.1 Resp. ¶ 99.  Proux received an "Overall Performance Appraisal Score" of "Below Expectations."  *Id.*[10]

On February 6, 2012, an attorney representing Proux complained in a letter to Defendants that "[Proux] is consistently being harassed by current and former supervisors because of his race."  The letter asserted that Proux had previously complained about his treatment and alleged that the treatment violated federal, state and local laws.  Greene Proux Decl. (Dkt. 56) Ex. D; Defs. Proux 56.1 Stmt. ¶ 105; Proux 56.1 Resp. ¶ 105.[11]

---

[10]  Although Proux asserts that Bereswill and Sweeney collaborated on the performance review, there is no evidence that Sweeney had any role in drafting or preparing Proux's performance evaluation.  Proux 56.1 Resp. ¶ 101.  Proux's citations to the record notwithstanding, there is no evidence to support his assertion that Bereswill and Sweeney collaborated on the performance review.  *See* Sweeney Dep. 78:7-23, 92:19-93:2 (testifying that she had asked Bereswill for input for Sweeney's October 2011 Email to Human Resources; she denied having collaborated regarding his subsequent performance review); Bereswill 82:13-16 (Bereswill and Sweeney socialized at work and occasionally discussed Proux).

[11]  The communication from Proux's attorney did not mention religious or gender discrimination.  Greene Proux Decl. Ex. D; Defs. Proux 56.1 Stmt. ¶ 106; Proux 56.1 Resp. ¶ 106.  Defendants assert that this letter is the only record evidence of Proux ever complaining of discrimination while employed at the Bank.  Defs. Proux 56.1 Stmt. ¶ 107; *see also* Proux Dep. 191:19-192:2 (conceding that this letter is the only written document to which Proux can point that shows when he first brought his employment discrimination claim to the Bank's attention).  Proux asserts that he had previously complained of "discrimination" on several occasions, but when pressed at his deposition on specifically what he told the Bank, he could only recall complaining about specific instances of Sweeney's derogatory language and expressing his belief that Sweeney and Bereswill were conspiring against him.  Proux 56.1 Resp. ¶ 107 (citing Proux Dep. 87:8-90:25; 92:21-97:21; 102:21-103:5; 105:2-23).  The only time that Proux specifically testified as to *racial- or religious*-based discrimination was during a line of leading questioning from his attorney when he testified that the first time he complained to Human Resources about Sweeney he reported that he "thought" race or religion "might" be an issue.  *See* Proux Dep. 206:14-209:21**.**

On February 13, 2012, Proux spoke with personnel in Human Resources regarding his attorney's allegation of racial discrimination.  Defs. Proux 56.1 Stmt. ¶ 108.  According to a memorandum to file prepared after the meeting: "When [Proux] was given the opportunity to provide examples of the racial discrimination, he was not able to provide one. When he was asked directly about the basis of his claim of racial discrimination he made the comment 'What else could it be?'"  Greene Proux Decl. Ex. E, at 2.  Proux admits that, during the meeting, Human Resources asked him to provide specific examples to support his discrimination claim but insists that he referred them to his attorney.  Proux 56.1 Resp. ¶¶ 110-11; Proux Dep. 178-80.[12]

Proux was terminated on February 29, 2012.  Defs. Proux 56.1 Stmt. ¶ 117; Proux 56.1 Resp. ¶ 117.[13]  Following Proux's termination, an African American, Christian female took his

---

[12]  Proux's claim that he referred Human Resources to his attorney is inconsistent with the argument in his brief that he gave Human Resources a list of examples of differential treatment.  Proux Opp'n at 7 ("Notes taken by [Human Resources] demonstrate that Proux mentioned numerous specifics as to how he felt that he was being treated differently due to his race.  Greene Decl. Exh. E.  Despite given [sic] a list of examples of differential treatment, [Human Resources] concluded that there was no basis for determining that race or another prohibited factor was the reason for such treatment.").

The memorandum to file prepared by Human Resources personnel after Proux's February 13, 2012 meeting, Greene Proux Decl. Ex. E, confirms that Proux had previously complained about Sweeney's "abusive management style."  Id.  Per the memorandum, he claimed to have characterized the mistreatment as racial discrimination to a Human Resources employee, but that employee denied having ever receiving a complaint of racial discrimination.  Id.  The memorandum indicated that, when asked to provide examples of racial discrimination, Proux cited: (1) Sweeney giving him incorrect data for a spreadsheet, (2) his being assigned to a position directly reporting to Sweeney, (3) a higher workload than other Assistant Vice Presidents at the Bank, and (4) differential treatment such as Bereswill not greeting him in the same manner as others, making him account for his time, and "picking on" him for small things like not taking notes at meetings, and Sweeney not getting on the elevator with him.  Id.  None of Proux's examples of mistreatment is either expressly or impliedly tied to race.

[13]  According to Defendants, the decision to terminate Proux was made solely by Bereswill, Defs. Proux 56.1 Stmt. ¶ 119 (citing Bereswill Dep. 194; Bereswill Decl. ¶ 39), and Bereswill was not aware at that time that Proux had complained of discrimination, nor was she aware of his lawyer's February 6, 2012 letter, Defs. Proux 56.1 Stmt. ¶ 120 (citing Bereswill Dep. 186-189, 198; Bereswill Decl. ¶ 40).  According to Proux, all of these assertions are incorrect.  He asserts that: his termination began with Sweeney's initial demand that he be terminated; Sweeney participated in the decision to terminate him insofar as she and Bereswill were collaborating to highlight deficiencies in his performance; and Bereswill was "aware of Proux's complaint about Sweeney" even if not aware of his lawyer's letter.  Proux 56.1 Resp. ¶¶ 118-121 (citing Stoler Decl. Ex. M; Sweeney Dep. 78:7-23; Bereswill Dep. 82:13-16, 189:13-15, 191:9-16).  Proux's claims, however, are based on pure speculation—he offers no admissible evidence to support his claim that Sweeney played any role in the decision to terminate him or that Bereswill was aware of Proux's discrimination claims at that time.

position and received an "Exceeds Expectations" performance evaluation before she voluntarily left the Bank after one year.   Defs. Proux 56.1 Stmt. ¶¶ 122-23; Proux 56.1 Resp. ¶¶ 122-23.

## II.    Plaintiff Kim Newsome

Plaintiff Kim Newsome was also an employee at IDBNY.  Newsome is an African American man who self-identifies as Protestant.  Am. Compl. ¶ 39.  He was employed at the Bank for less than a year in the Commercial Real Estate Department ("CRE Department") as a Loan Administrator, with the corporate title of Assistant Vice President.  *Id.* ¶¶ 40, 281.

In July 2011, before Newsome was hired, Herbert Fried, Senior Vice President at IDBNY and Department Head for the CRE Department, sought a loan administrator to replace Eileen Healy, who was transferring to a different department.  Defs. Newsome 56.1 Stmt. ¶¶ 11-12; Newsome 56.1 Resp. ¶¶ 11-12.  Healy recommended Newsome for the position based on their previous work together at Emigrant Savings Bank ("Emigrant").  Defs. Newsome 56.1 Stmt. ¶¶ 14, 16; Newsome 56.1 Resp. ¶¶ 14, 16.[14]  Before being hired, Newsome was interviewed by Healy, Fried and several other Bank employees, including Marc Cooper, a loan officer to whom Newsome would ultimately report.  Defs. Newsome 56.1 Stmt. ¶¶ 21-22; Newsome 56.1 Resp. ¶¶ 21-22; Healy Dep. (Dkt. 63-5) at 25.  Newsome had previous financial services experience, Newsome Decl. (Dkt. 74) Ex. A, and had been an Assistant Vice President at his previous job.  Defs. Newsome 56.1 Stmt. ¶ 20; Newsome 56.1 Resp. ¶ 20.  Healy believed that Newsome was the best candidate for the position.  Healy Dep. 25:10-27:23.

Newsome was offered a position as Assistant Vice President.  Defs. Newsome 56.1 Stmt. ¶¶ 24-25; Newsome 56.1 Resp. ¶¶ 24-25; Fried Decl. (Dkt. 61) Ex. C.  The offer letter stated that

---

[14]    The parties dispute whether Newsome left Emigrant because he was "laid off" due to market conditions, as he represented on his IDBNY job application, Defs. Newsome 56.1 Stmt. ¶ 17; Newsome 56.1 Resp. ¶ 17, or whether he was terminated for "dishonesty," Defs. Newsome 56.1 Stmt. ¶ 18; Newsome 56.1 Resp. ¶ 18.

it, "together with the Bank Policies and the Confidentiality Agreement, form the complete and exclusive statement of the terms of your employment with the Bank" and "[t]he employment terms in this Offer Letter supersede any other agreements or promises made to you by anyone, whether oral or written."  Fried Decl. Ex. C.[15]  The letter did not provide any immediate paid time off or other benefits beyond those typically offered to new employees, and Newsome concedes he did not specifically request paid time off during his interview or upon signing the offer letter.  Defs. Newsome 56.1 Stmt. ¶ 27; Newsome 56.1 Resp. ¶ 27.

Newsome began work at the Bank in August 2011.  Defs. Newsome 56.1 Stmt. ¶ 28.  His primary responsibilities were to help set up and close commercial real estate loans, liaise with the Loan Officers in different departments, and handle all administrative and operational requirements for the Bank's existing real estate loans.  Defs. Newsome 56.1 Stmt. ¶ 30; Newsome 56.1 Resp. ¶ 30.[16]  For approximately two months, Healy was assigned to help train him in his new position, and Newsome was expected to shadow Healy to get a better understanding of the CRE Department.  Defs. Newsome 56.1 Stmt. ¶¶ 32-33; Newsome 56.1 Resp. ¶¶ 32-33.

All new employees below the level of First Vice President, including Newsome, were required to complete an initial probationary period of ninety days.  Defs. Newsome 56.1 Stmt. ¶¶ 37-38; Newsome 56.1 Resp. ¶¶ 37-38.  After the initial probationary period, an employee can be

---

[15]     Newsome testified that, during the interview, Fried told him he would have greater duties than a loan administrator and that, once he was hired, Fried would make the position a Vice President position with the title Operations Manager.  *See* Newsome 56.1 Resp. ¶ 23 (citing Newsome Dep. (Dkt 63-4) at 37:21-38:4, 44:23-45:8, 78:22-79:5).  None of those alleged commitments was reflected in the offer letter Newsome signed.

[16]     Defendants assert that, given the scope of his responsibilities, Newsome's regular attendance and availability in the office were critical.  Defs. Newsome 56.1 Stmt. ¶ 31.  Newsome admits that he was required to have regular attendance but disputes that there was any need for him to be more available than other employees in the Department.  Newsome 56.1 Resp. ¶ 31.

(i) kept as a full-time, at-will employee; (ii) terminated; or (iii) kept as a probationary employee to allow the Bank to further time evaluate the employee.  Defs. Newsome 56.1 Stmt. ¶ 39; Newsome 56.1 Resp. ¶ 39.

Newsome got off to a rocky start at the Bank.  Although he officially reported to Fried, much of his daily work was directed by Cooper.  Newsome Decl. ¶ 10.  Newsome testified that Cooper did not allow him to take a full hour lunch break, Newsome Dep. 116:13-22,[17] and required him to stay beyond 5:00 p.m., *id.* 119:3-121:9.  Defendants argue, however, that Plaintiff was not reprimanded for going to spin class or taking an hour-long lunch generally but instead only "for going to spin class, or being out of the office on other personal matters, when urgent work needed to be completed."  Defs. Newsome 56.1 Stmt. ¶¶ 87-88 (citing Fried Decl. ¶ 33); *see also* Fried Decl. Ex. D (Employee Warning Notice stating that Newsome has "at times left the bank for spin class or to meet with family members when urgent work required completion").  Newsome testified that, in late November 2011, he complained to Fried that he was being discriminated against regarding his lunch break, Newsome Dep. 116:13-119:2, and the requirement that he stay beyond 5:00 p.m., *id.* 119:3-121:9.[18]  Newsome also says he discussed with Fried signing authority (which allows a Bank employee to certify certain financial documents in relation to closings and Bank transactions, Fried Decl. ¶ 37) and asked when his probationary period would end.  Newsome Dep. 125:4-132:23.  Fried, however, states that

---

[17]  Newsome attended spin class during his lunch break—his work email suggests that he reserved a bike for at least thirty-five classes during the seven months that he was employed by the Bank.  Defs. Newsome 56.1 Stmt. ¶ 86; Newsome 56.1 Resp. ¶ 86.

[18]  Newsome testified that he told Fried "[t]hat there is [sic] acts of discrimination that's taking place within this department.  I am being treated differently . . . And I need an explanation as to why."  Newsome Dep. 115:12-17.  When asked during his deposition for examples of the discrimination that he reported to Fried, Newsome testified he told Fried about the "ill treatment and how [he] was being treated differently from others," including Cooper's comments about his lunch break and his need to stay beyond 5:00 p.m.  Newsome Dep. 115-21.  As described by Newsome, his complaint did not raise racial, gender or religious discrimination but only differential treatment from other employees.

"Plaintiff . . . never raised any complaints of discrimination with [him] and . . . never complained about Mr. Cooper's treatment of him."  Fried Decl. ¶ 28.

Around December 2011, Newsome met with Human Resources to inquire why he had not been notified that he was off probation or approved for signing authority and to complain that he was being treated differently than other employees.  Newsome Dep. 134-138.  Newsome testified that Human Resources had no information about his extended probation.[19]

In the first few months of his employment, several things happened to which Newsome now objects.  For instance, Cooper allegedly denied him a day off to take care of an ill brother (Newsome was not eligible for paid vacation until after six months of employment; ultimately his request was granted), Newsome Dep. 88-90, but Cooper granted a white female employee, Elena Dokianos, paid time off during her first six months of employment, Defs. Newsome 56.1 Stmt. ¶¶ 101-06; Newsome 56.1 Resp. ¶¶ 101-06; Newsome 56.1 Stmt. ¶¶ 124-25; Defs. 56.1 Resp. ¶¶ 124-25.[20]  Newsome also testified that the Bank granted informal mentorship to Jewish employees, like David I. Cohen[21] and Jeff Marcus, but not to Newsome.  Newsome Dep. 97:24-108:14; *see also* Defs. Newsome 56.1 Stmt. ¶¶ 112-15; Newsome 56.1 Resp. ¶¶ 112-15; Newsome 56.1 Stmt. ¶¶ 126-27; Defs. 56.1 Resp. ¶¶ 126-27.[22]  Newsome testified that he could

---

[19]  According to Newsome, to highlight his lack of knowledge of Newsome's extended probation, the Human Resources employee with whom he met held up an empty folder with Newsome's name on it.  Newsome Dep. 136:7-21; Newsome 56.1 Stmt. ¶ 128.

[20]  Although Newsome asserts in his 56.1 Statement that he was not allowed to take time off and Dokianos was, Newsome 56.1 Resp. ¶¶ 101-06; Newsome 56.1 Stmt. ¶¶ 124-25, Newsome admitted in his deposition that he was allowed to take a day off to attend to his brother, although he complained that permission came after much "travail."  Newsome Dep. 89-95.

[21]  David I. Cohen is a different IDBNY employee than David Cohen, COO of the Credit Administration Department.  Because Newsome's and Proux's factual scenarios do not overlap, this opinion refers to both as Cohen.

[22]  The parties dispute whether Healy's training of Newsome at the beginning of his employment constituted informal "mentoring."  Defs. Newsome 56.1 Stmt. ¶¶ 32-34; *but see* Newsome 56.1 Resp. ¶¶ 32-34.

not discipline Jewish employee Cohen, whom Newsome alleges he supervised, for tardiness because Lisa Baum, whom Newsome alleges was the Bank's Executive Vice President at the time, Am. Compl. ¶¶ 243-44, told Newsome that the Bank was cultivating Cohen and trying to maintain a "legacy bank."  Newsome Dep. 258-260, 290:11-19.[23]

Finally, according to Newsome, in late 2011, Cooper began to call him "Mr. Big" or "Big."  *See generally* Newsome Dep. 138:14-159:15; Defs. Newsome 56.1 Stmt. ¶¶ 47-59; Newsome 56.1 Resp. ¶¶ 47-59.[24]  Newsome testified that he informally reported these comments to Human Resources towards the end of 2011 but declined to file a formal complaint.  Newsome 56.1 Resp. ¶¶ 49-51; Newsome Dep. 159:16-164:4; *but see* Defs. Newsome 56.1 Stmt. ¶ 49 (disputing that Plaintiff ever reported the alleged comments to Human Resources or ever claimed that Cooper was discriminating against him).

Newsome's probationary period was scheduled to end on November 22, 2011, but he was not provided with a probationary period evaluation until mid-January 2012.  Defs. Newsome 56.1 Stmt. ¶¶ 42-43; Newsome 56.1 Resp. ¶¶ 42-43.[25]

---

[23]    Current and former IDBNY employees were asked during their depositions whether they had ever heard the term "legacy bank," and all denied having ever heard it.  *See* Defs. Newsome 56.1 Stmt. ¶¶ 108-09 (citing Cooper Dep. 132, Stonitsch Dep. 25, Greene Dep. 70, Guzman Dep. 43); *see also* Sweeney Dep. 95).  Neither party submitted testimony from Lisa Baum.

[24]    Although Newsome testified in his deposition that there were three instances of Cooper calling him Mr. Big in 2011 and none in 2012, Newsome Dep. 152:13-153:20, he later testified (after reviewing the Amended Complaint at his attorney's direction) that a separate occasion occurred in January 2012 and that the comments occurred on a weekly basis, Newsome Dep. 287:13-296:24; *see also* Defs. Newsome 56.1 Stmt. ¶¶ 54-56; Newsome 56.1 Resp. ¶¶ 54-56.  Newsome testified that he believed the comments were in reference to the size of his genitalia, because the first time Cooper said anything was when they were standing at adjacent urinals.  Newsome Dep. 138-43.  Cooper denies ever making these comments.  Cooper Dep. (Dkt. 63-6) 84-86.  Newsome previously levied similar allegations against a colleague at his previous employer, Emigrant.  Stoler Newsome Decl. (Dkt. 63) Exs. M, N; *see also* Defs. Newsome 56.1 Stmt. ¶¶ 58-59; Newsome 56.1 Resp. ¶¶ 58-59.

[25]    Defendants assert that the delay was due to heavy workload in the CRE Department and the end of the year holidays.  Defs. Newsome 56.1 Stmt. ¶ 43; Fried Decl. ¶ 16.  Newsome disputes that explanation, asserting that the Department had no loan closings in November 2011 and only two in December 2011, Newsome 56.1 Resp. ¶ 43; Newsome Decl. ¶ 9, and testified that he believed Cohen and Marcus, who were hired around the same time as he was, received timely evaluations.  Newsome Dep. 172:17-176:12; Newsome Decl. ¶ 8.  Notwithstanding

In their probationary period evaluation of Newsome, Newsome's supervisors identified performance problems, Defs. Newsome 56.1 Stmt. ¶ 60, including exercising poor judgment, not following instructions, and failing to align himself with the priorities of the CRE Department, Defs. Newsome 56.1 Stmt. ¶ 44 (citing Fried Decl. Ex. D (Newsome's January 2012 Employee Evaluation Report)).  Defendants specifically noted that Newsome left the office to meet with a family member and was not available to handle critical tasks associated with closing a loan to the Hotel Victor (the "Hotel Victor Closing").  Defs. Newsome 56.1 Stmt. ¶ 45; Cooper Dep. 41-47.[26]

On January 17, 2012, Fried and Cooper advised Newsome that they were extending his initial probationary period for another sixty days until March 17, 2012, to give him time to improve his performance.  Defs. Newsome 56.1 Stmt. ¶ 62; Newsome 56.1 Resp. ¶ 62.  They provided Newsome with an Employee Evaluation Report and an Employee Warning Notice ("Written Notice") and explained the basis for their decision to extend his probation.  Defs. Newsome 56.1 Stmt. ¶ 62; Newsome 56.1 Resp. ¶ 62.

The Employee Evaluation Report reflected a mix of "Satisfactory" and "Unsatisfactory" marks.  Fried Decl. Ex. D; Defs. Newsome 56.1 Stmt. ¶ 63.  The Written Notice indicated the infraction was for "Low Productivity" and "Performance Issues," described Newsome's failure "at times to handle the work duties required of his position," and cited, of significant concern, the delay in closing a large loan "due to the lack of preparation on Mr. Newsome's part."  Fried

---

Newsome's *belief* about the timing of other employees' reviews, Cohen did not receive his probationary period review until mid-January 2012, one day after Newsome. Greene Reply Newsome Decl. (Dkt. 84) ¶¶ 4-6.

[26]    Newsome denies any responsibility for the problems associated with the Hotel Victor Closing.  In Newsome's view, another employee made a last minute change to the terms of the loan, creating a need for "same day funding."  When Newsome returned to the office after having left for forty-five minutes to deal with a personal issue, he learned that the loan needed same-day funding.  According to Newsome, he made the arrangements, and the loan successfully closed.  Newsome 56.1 Resp. ¶ 45; Newsome Decl. ¶¶ 12-17; Newsome Dep. 197:18-204:14.

Decl. Ex. D; Defs. Newsome 56.1 Stmt. ¶ 64.  The Notice further indicated that Newsome had

exhibited difficulty handling other loan closings, failed to provide documentation on a timely

basis, failed to update accurately a document tickler report, and did not always align himself with

the priorities of the Bank when he "consistently leaves the bank at 5PM and has at times left the

bank for spin class or to meet with family members when urgent work required completion."

Fried Decl. Ex. D; Defs. Newsome 56.1 Stmt. ¶ 64.  The Written Notice stated that Newsome

needed to improve his planning, prioritization of tasks, multitasking, and timely execution of

tasks.  Fried Decl. Ex. D; Defs. Newsome 56.1 Stmt. ¶ 65.  Newsome was given sixty days to

show improvement.  Fried Decl. Ex. D; Defs. Newsome 56.1 Stmt. ¶ 66.  In the employee

comments section of the Written Notice, Newsome did not dispute any of the performance

criticism (including the criticism related to the Hotel Victor Closing to which he has taken

exception in this Court), responding only: "I take lunch on a daily basis during my lunch period I

take a spinning class.  The Bank entitles each employee the opportunity to take lunch on a daily

basis."  Fried Decl. Ex. D; Defs. Newsome 56.1 Stmt. ¶ 68; *but see* Newsome 56.1 Resp. ¶ 68

(Newsome asked Fried for more time to review and comment but Fried insisted that he

immediately sign the document).  Newsome's performance did not improve, and the CRE

Department began looking for a replacement in mid-February 2012.  Defs. Newsome 56.1 Stmt.

¶¶ 71-72.

On March 5, 2012, IDBNY received a letter from the same attorney who was

representing Proux, asserting that, like Proux, Newsome was also the "victim of [IDBNY's]

racial discrimination and abuse."  Greene Newsome Decl. (Dkt. 62) Ex. G, at 1.  The letter

alleged that Newsome: had been placed on a longer post-hire probationary period than white,

Jewish employees; did not receive signing authority when other non-African American

employees did; was disciplined for lateness from lunch when other white, Jewish employees

were excused; and had not been provided even one paid day off when another new hire had been

given time off.  *Id.*  Referencing the February 6, 2012 Letter to IDBNY about Proux, Newsome's

letter accused the Bank of a pattern and practice of preferential treatment toward white, Jewish,

and Asian employees at the expense of African American workers.  *Id.*[27]  Human Resources and

in-house counsel for the Bank investigated the allegations and concluded that they were

meritless.  Defs. Newsome 56.1 Stmt. ¶ 79; Greene Newsome Decl. ¶ 16.

On March 19, 2012, Fried terminated Newsome's employment.  Defs. Newsome 56.1

Stmt. ¶ 80; Newsome 56.1 Resp. ¶ 80.  A memorandum dated March 16, 2016, from Fried and

Cooper to Human Resources stated that Newsome's performance had not sufficiently improved

to warrant retaining him.  It cited an inability to multitask, non-responsiveness to co-worker

requests for information, failure to update a CRE document tickler report, failure to align himself

with the priorities of the CRE Department, failure to complete tasks on time, leaving work at

5:00 p.m. when there was more work to complete, and making excuses or reasons to leave the

office instead of working.  Defs. Newsome 56.1 Stmt. ¶ 81; Fried Decl. Ex. E.

## III.   Procedural History

On May 23 and 24, 2012, respectively, Proux and Newsome filed separate complaints

with the Equal Employment Opportunity Commission ("EEOC"), and on June 25, 2013, the

EEOC issued right to sue letters to both Plaintiffs.  Defs. Proux 56.1 Stmt. ¶¶ 124-128; Defs.

Newsome 56.1 Stmt. ¶¶ 116-120; *see also* Stoler Proux Decl. Exs. Q-T (EEOC documents

---

[27]      The letter did not allege gender discrimination and did not mention Cooper's alleged sexual comments.  *See*
Greene Newsome Decl. Ex. G; Defs. Newsome 56.1 Stmt. ¶ 75; Newsome 56.1 Resp. ¶ 75.  According to
Defendants, the March 5th Letter is the only evidence in the record that Newsome ever complained of unlawful
discrimination during his employment.  Defs. Newsome 56.1 Stmt. ¶ 76.  Newsome, however, asserts that he
previously complained of "discrimination" to Fried and Human Resources.  Newsome 56.1 Resp. ¶ 76 (citing
Newsome Dep. 111:20-112:5, 115:10-20, 133:8-133:22).  As noted in note 18, *supra*, however, even in Newsome's
retelling, he complained of differential treatment, but he never tied the differential treatment to his race, religion or
gender.

relating to Proux's race and religious discrimination and retaliation complaints); Stoler Newsome Decl. Exs. Q-T (EEOC documents relating to Newsome's race discrimination and retaliation complaints).  Newsome's EEOC complaint did not raise religious or gender discrimination or retaliaion, and Proux's did not raise gender discrimination or retaliation.

Plaintiffs jointly initiated this action on September 17, 2013.[28]  On September 3, 2014, Plaintiff filed an Amended Complaint (Dkt. 39), and, on September 24, 2014, Defendants' filed an Answer and Affirmative Defenses to Plaintiffs' Amended Complaint (Dkt. 44).  Defendants moved for summary judgment, separately, as to Plaintiff Proux (Dkt. 54) and Plaintiff Newsome (Dkt. 60).

## DISCUSSION

Plaintiffs assert eighteen causes of action in their Amended Complaint, alleging race, color, and ethnicity discrimination and retaliation under Title VII, Section 1981, the NYSHRL, and the NYCHRL, discrimination and retaliation based on religion under Title VII, the NYSHRL, and the NYCHRL, and gender discrimination and retaliation under the NYSHRL and the NYCHRL.[29]  Defendants move for summary judgment as to all claims.

---

[28]    On August 26, 2014, this Court granted in part and denied in part Defendants' partial motion to dismiss the initial Complaint.  *See* Dkt. 38.

[29]    "Before bringing a Title VII suit in federal court, an individual must first present 'the claims forming the basis of such a suit . . .  in a complaint to the EEOC or the equivalent state agency.'"  *Littlejohn v. City of New York*, 795 F.3d 297, 322 (2d Cir. 2015) (quoting *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006)). "Unlike Title VII, claims under § 1981, NYSHRL and NYCHRL do not require exhaustion of administrative remedies." *Melie v. EVCI/TCI Coll. Admin.*, No. 08 CIV. 5226 (HB), 2009 WL 1404325, at *5 (S.D.N.Y. May 20, 2009), *aff'd*, 374 F. App'x 150 (2d Cir. 2010).

Both Plaintiffs exhausted their Title VII race discrimination and retaliation claims.  Although Proux did not assert retaliation on the face of the Notice of Charge, Stoler Proux Decl. at Ex. R, retaliation was expressly included in his EEOC Complaint, *id.* at Ex. Q. Regarding the religious discrimination and retaliation claims, Proux checked the box on the Notice of Charge for Religion and, accordingly, exhausted these claims before the EEOC.  *Id.* at Ex. R.  Newsome, however, did not check the "Religion" box in his Notice of Charge.  Stoler Newsome Decl. at Ex. R. Merely referring in his EEOC Complaint to preferential treatment to Jewish employees does not suffice to exhaust those claims.  Accordingly, Newsome may only bring a claim of religious discrimination under the NYSHRL and the NYCHRL.  Finally, neither Proux nor Newsome exhausted their gender discrimination and retaliation claims. Their Amended Complaint, however, only brings those claims under the NYSHRL and the NYCHRL.

### I.    Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A material fact is

one that would 'affect the outcome of the suit under the governing law,' and a dispute about a

genuine issue of material fact occurs if the evidence is such that 'a reasonable [factfinder] could

return a verdict for the nonmoving party.'" *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d

Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "'[w]here

the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal

quotation marks omitted)).

"To survive summary judgment, the nonmovant must merely show that 'reasonable

minds could differ as to the import of the evidence . . . in the record.'" *Cortes v. MTA New York

City Transit*, 802 F.3d 226, 230 (2d Cir. 2015) (quoting *R.B. Ventures, Ltd. v. Shane*, 112 F.3d

54, 59 (2d Cir. 1997)). To overcome a motion for summary judgment, however, Plaintiffs may

not "rely on mere conclusory allegations nor speculation, but instead must offer some hard

evidence showing that [his] version of the events is not wholly fanciful." *D'Amico v. City of

New York*, 132 F.3d 145, 149 (2d Cir.), *cert denied* 524 U.S. 911 (1998). "'[I]n assessing the

record to determine whether there is a genuine issue as to any material fact, the court is required

to resolve all ambiguities and draw all factual inferences in favor of the party against whom

summary judgment is sought.'" *Noll v. IBM Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting

*Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 36 (2d Cir. 1994)).

"At summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001). "A motion for summary judgment may be defeated where 'a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)). When all is said and done, however, "[s]ummary judgment cannot be defeated by the presentation by the plaintiff of but a 'scintilla of evidence' supporting [his] claim." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson*, 477 U.S. at 252).

## II.   Neither Proux nor Newsome Has Established Unlawful Discrimination[30]

Courts analyze Title VII, Section 1981, and NYSHRL claims "under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *see also Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's

---

[30]     Proux has abandoned his gender discrimination claims. During his deposition and again in his 56.1 Response, Proux conceded that he believes he was discriminated against only because of his race and religion. Proux 56.1 Resp. ¶ 133; Proux Dep. 26-27, 206. Moreover, in his opposition, Proux does not challenge Defendants' arguments regarding the absence of evidence of gender discrimination. *Jackson v. Fed. Express*, 766 F.3d 189, 195-96, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition [to a summary judgment motion] that relevant claims or defenses that are not defended have been abandoned.").

reason is in fact pretext for unlawful discrimination." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014); *see also Littlejohn*, 795 F.3d at 307-08.

The Second Circuit "has repeatedly emphasized 'the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent.'" *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).  "'Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *LeBlanc v. United Parcel Serv.*, No. 11 CIV. 6983(KPF), 2014 WL 1407706, at *10 (S.D.N.Y. Apr. 11, 2014) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)).  But "[e]ven in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment and show more than some metaphysical doubt as to the material facts." *Gorzynski*, 596 F.3d at 101 (internal quotation marks and citations omitted).

### A.  Neither Proux nor Newsome has established a *prima facie* case of discrimination

To establish a *prima facie* case of discrimination, a "plaintiff does not need substantial evidence of discriminatory intent." *Littlejohn*, 795 F.3d at 311.  If a plaintiff adduces evidence to show:

> (1) that [he] is a member of a protected class, (2) that [he] was qualified for the position [he] sought, (3) that [he] suffered an adverse employment action, and (4) can sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation, then [he] has satisfied the *prima facie* requirements and a presumption of discriminatory intent arises in h[is] favor, at which point the burden of production shifts to the employer, requiring that the employer furnish evidence of reasons for the adverse action.

*Id.* (emphasis in original); *see also Abrams*, 764, F.3d at 251-52; *Zann Kwan v. Adalex Grp.*

*LLC*, 737 F.3d 834, 844 (2d Cir. 2013) ("The plaintiff's burden of proof as to this first step has

been characterized as 'minimal' and '*de minimis*.'" (quotation marks and citations omitted)).

"At this stage, a plaintiff seeking to defeat a defendant's motion for summary judgment would

not need evidence sufficient to sustain h[is] ultimate burden of showing discriminatory

motivation, but could get by with the benefit of the presumption if []he has shown evidence of

the factors entitling h[im] to the presumption." *Littlejohn*, 795 F.3d at 311.  Defendants argue

that neither Proux nor Newsome has adduced evidence adequate to establish the second and

fourth elements of a *prima facie* case.

> **1. Proux and Newsome have established that they were qualified for their positions.**

Defendants rely on outdated case law to support their argument that Plaintiffs must show

that they were "performing [their] duties satisfactorily."  Defs. Proux Mem. at 14-15 (citing

*McLee v. Chrysler Corp.*, 109 F.3d 130, 134-35 (2d Cir. 1997)); Defs. Newsome Mem. at 12

(citing same).  In *Slattery v. Swiss Reinsurance Am. Corp*, 248 F.3d 87, 91-92 (2d Cir. 2001), the

Second Circuit noted that the satisfactory showing "overstate[s] the requirements for a *prima*

*facie* case."  The *Slattery* court explained that "a mere variation in terminology between

'qualified for the position' and 'performing . . . satisfactorily' would not be significant so long

as, in substance, all that is required is that the plaintiff establish basic eligibility for the position

at issue, and not the greater showing that he satisfies the employer."  *Id.* at 91-92.  "[P]laintiff

must show only that he possesses the basic skills necessary for performance of [the] job. . . .

[E]specially where discharge is at issue and the employer has already hired the employee, the

inference of minimal qualification is not difficult to draw."  *Id.* at 92 (internal quotation marks

and citation omitted).  "It is unusual for a plaintiff to fail to meet this standard."  *Donnelly v.*

*Greenburgh Central Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012).

Under this standard, both Proux and Newsome have established that they were qualified

for their positions.  Proux had twelve years of experience in the financial services industry when

he was hired, Proux Decl. Ex. A, and, in his first year, he received a satisfactory evaluation from

Cartin indicating that he "[Met] Expectations."  Defs. Proux 56.1 Stmt. ¶ 19; Proux 56.1 Resp. ¶

19.  Similarly, Newsome had significant financial services experience when he was hired and

had been an Assistant Vice President at a previous job.  Newsome Decl. Ex. A; Defs. Newsome

56.1 Stmt. ¶ 20; Newsome 56.1 Resp. ¶ 20.

### 2. Neither Proux nor Newsome has established that the circumstances surrounding any adverse employment actions give rise to an inference of unlawful discrimination

It is not entirely clear what Plaintiffs assert are the discriminatory adverse employment

actions at issue in their case.  Plaintiffs' Amended Complaint alleges that unlawful employment

practices include, but are not limited to:

> [harassing Mr. Newsome with comments related to his genitalia;] giving Plaintiffs
> questionable discriminatory write-ups; refusing to promote Mr. Newsome to a VP
> position; refusing to provide Plaintiffs professional mentorship and/or
> opportunities that other White employees and/or employees of Jewish
> religion/heritage received; transferring Mr. Proux out of his department; isolating
> Mr. Proux from other employees; and terminating Plaintiffs' employment.

Am. Compl. ¶¶ 458, 490, 517, 541, 568, 592, 617, 646, 672.[31]

---

[31]     Specific to Newsome, Defendants argue that certain of the Bank's actions do not meet the third element of
a *prima facie* case because they do not constitute adverse employment actions—these include extending Newsome's
probationary period, not granting him signing authority, counseling him for taking extended lunch breaks, denying
him paid time off, not promoting him to a Vice President position, and not assigning him a mentor.  Defs. Mem. at
13 & n.13.  Newsome does not challenge those arguments but instead relies on those actions as giving rise to an
inference of discrimination.  Newsome Opp'n at 16-18.  Because Newsome cannot demonstrate a *prima facie* case
as to any of the above, it is not necessary to resolve the precise parameters of the claimed adverse actions.

The question becomes whether Proux or Newsome has established that any alleged adverse employment actions occurred under circumstances from which a jury could reasonably infer that Defendants acted with a discriminatory intent. *See Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009). Absent direct evidence demonstrating discriminatory intent, which neither Proux or Newsome has presented, "[a]n inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)); *see also Sassaman*, 566 F.3d at 312. Neither Newsome nor Proux is particularly clear as to how the evidence gives rise to an inference of discrimination. It appears, however, that they are attempting to show that they were treated less favorably than employees not in their protected group.

Regarding differential treatment, "[a] showing that the employer treated a similarly situated employee differently is 'a common and especially effective method' of establishing a prima facie case of discrimination . . . ." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (quoting *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001)). But when a plaintiff seeks to establish a minimal *prima facie* case by pointing to disparate treatment of a similarly situated employee, the employee to whom the plaintiff points must be "similarly situated in all material respects," or, put differently, the other employee must be in "a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *McGuinness*, 263 F.3d at 53-54 (citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60 (2d Cir. 1997)). "[T]heir circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances.

24

What is key is that they be similar in significant respects." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001) (internal citations omitted); *see also Baity v. Kralik*, 51 F. Supp. 3d 414, 445 (S.D.N.Y. 2014) ("What constitutes all material respects varies, of course, from case to case, but the plaintiff and those he maintains were similarly situated must have been subject to the same workplace standards, which requires a reasonably close resemblance of facts and circumstances." (internal quotation marks, alterations, and citations omitted) (quoting *Taylor v. Seamen's Soc'y for Children*, No. 12-CV-3713, 2013 WL 6633166, at *14 (S.D.N.Y. Dec. 17, 2013)); *Potash v. Florida Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 580 (S.D.N.Y. 2013) ("Employment characteristics which can support a finding that two employees are similarly situated include similarities in education, seniority, performance, and specific work duties and similar requirements for skill, effort and responsibility for jobs performed under similar working conditions." (internal quotation marks and citation omitted)).   Whether two people are similarly situated is generally a question of fact for the jury, but this rule is not absolute, and a court may properly grant summary judgment where it is clear that no reasonable jury could find that a plaintiff was similarly situated to the alleged comparable employee. *Lizardo*, 270 F.3d at 101, 104 ("[A] jury cannot infer discrimination from thin air" when plaintiffs merely cited mistreatment and asked the court to conclude it must have been related to race); *Potash*, 972 F. Supp. 2d at 580.   The Court first addresses Proux, then Newsome.

### (a) Proux

Although the bar is low, Proux has not submitted sufficient admissible evidence to raise an inference of discrimination.   In support of such an inference, Proux points to the following: he believes Sweeney was more hostile to him than she was to others; Healy said Sweeney and Bereswill were out to get him; he was reprimanded for poor work product but other employees working on the same project were not reprimanded; Proux was given fewer resources to

complete correction of the document tracking project than were provided to Healy, a white

female; a white Jewish employee who also failed to perform assigned duties was not

reprimanded, received an acceptable evaluation and received a bonus; and Proux was criticized

by Lisa Baum for giving information directly to the Bank's regulators rather than complying

with the Bank's procedures.

First, Proux contends that Sweeney's verbal abuse gives rise to an inference of

discrimination because it "was directed at him more than other employees . . . and that

Sweeney's hostility extended even further to him through attempts to sabotage his work, and a

refusal to even travel in the elevator with [him]." Proux Opp'n at 16. Although the parties

dispute whether Sweeney ever treated any employee the way Proux claims, *see* Bereswill Dep.

190:7-191:3, drawing all ambiguities and inferences in Proux's favor that she treated him as he

alleges, the facts still do not give rise to an inference of unlawful discriminatory animus based on

Proux's race or religion. None of the derogatory names that Proux testified Sweeney used—

"jackass," "stupid," "idiot," "retard," "loser," and "lazy," Defs. Proux 56.1 Stmt. ¶ 23; Proux

56.1 Resp. ¶ 23; Proux Dep. 63, 85-92; Proux Parkhurst Decl. (Dkt. 76) Ex. B—imply the race-

or religion-based animus that Proux urges. Sweeney's alleged comments are indisputably race

and religion neutral, and Proux fails to offer any other factor—context, inflection, tone of voice,

local custom, or historical usage—from which the Court could infer a discriminatory animus

from the use of the terms.[32] Moreover, Proux's assertion that Sweeney's verbal abuse was more

frequently directed at him than other employees is undercut by his own evidence that Sweeney's

---

[32]     Proux's reliance on *Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006), and *Anderson v. England*, 359 F. Supp.
2d 213, 218 (D. Conn. 2005), is misplaced as there were other factors in those cases from which the fact finder could
infer a racial or gender bias. In *Ash*, the term "boy" was used with reference to a grown African-American man; that
term is widely viewed as having racial undertones in that context. 546 U.S. at 456. In *Anderson*, the supervisor's
comments that plaintiff was "fat, stupid, and lazy" were coupled with other explicitly discriminatory comments such
as "all men are worthless." 359 F.3d at 218.

alleged verbal hostility was ecumenical: it extended to men, women, Jews, Gentiles, Hispanics, African-Americans and whites.  Defs. Proux 56.1 Stmt. ¶¶ 26-31; Pls. Proux 56.1 Resp. ¶¶ 26-31.  Even when drawing all inferences in Proux's favor that he may have received heightened negative treatment from Sweeney, Proux has not provided any evidence from which to infer that such treatment was based on any racial or religious animus.

Proux also points to Healy's alleged comment that Sweeney and Bereswill were "out to get him" and that he should get a lawyer.  Proux Opp'n at 14-15.  This "evidence," which comes only from Proux and Newsome, Proux Decl. ¶¶ 18-23; Newsome Decl. ¶ 25, is inadmissible hearsay to prove that Sweeney and Bereswill were "out to get" Proux, Fed. R. Evid. 802, and, even if it were admissible, there is nothing to suggest that the alleged conspiracy against Proux existed because of his race or religion.[33]

The balance of Proux's factual allegations do not lead to an inference of discrimination. Starting with the other employees who worked on the project for which Proux was reprimanded, Proux acted in a supervisory role in the department and offers no evidence to establish that he was similarly situated to the other employees who worked on the project.  Proux argues that he "was the only [employee] reprimanded and given a negative evaluation on work relating to the document tracking project, which was the effort of at least 10 workers," none of whom was

---

[33]    In addition, Proux raised this allegation for the first time in his affidavit in support of his opposition to summary judgment.  When asked at his deposition if "[a]side from the allegations that are set forth in [the Amended Complaint], are there any other claims or allegations or facts that you think are missing from that Complaint," he answered, "None that I can think of."  Proux Dep. 26:3-9.  "Waiting until plaintiffs have read or been briefed as to defendant's summary judgment motion before they 'remember' what happened is not permitted.  Plaintiffs cannot testify in deposition that they have identified all of the facts underlying their claims, and then submit an affidavit in which they happen to recollect other key facts."  *Bright v. Coca Cola Refreshments USA, Inc.*, No. 12 CIV. 234(BMC), 2014 WL 5587349, at *5 (E.D.N.Y. Nov. 3, 2014), *aff'd*, --- F. App'x ---, No. 14-4465-CV, 2015 WL 9261278 (2d Cir. Dec. 18, 2015); *see also Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts [his] own prior deposition testimony.").  Accordingly, even if Proux's recitation of Healy's statement were admissible, Proux could not rely on these comments to defeat the motion for summary judgment.

black.  Proux Opp'n at 15 (citing Proux Decl. ¶¶ 6, 11-13).  Although the record is not entirely

clear regarding Proux's precise role in the document tracking project, it is clear that Proux had a

supervisory role in the Credit Administration Division as an Assistant Vice President.[34]  During

his deposition, Proux conceded, without caveat, that he was a supervisor with regard to some

employees in his department, including Spiegel, a white Jewish employee.  Proux Dep. 60:15-

61:21, 65:3-5.  He later qualified that testimony in his Declaration, stating that his supervision

only "concerned overseeing removal and return of loan documents from the bank's vault" and,

"[w]ith respect to entering the information into the bank's Loan IQ systems, [he] performed the

same work as they did, and did so at the direction of Ms. Sweeney."  Proux Decl. ¶ 8.

Defendants maintain that Proux was responsible for overseeing the tracking of all credit

documents and ensuring the accuracy of the reported information.  Defs. Proux 56.1 Stmt. ¶ 16

(Proux was expected to directly supervise four employees including Spiegel); Bereswill Decl. ¶¶

18-19 (Plaintiff was responsible for overseeing the tracking of all credit documents and ensuring

the accuracy of the reported information); Bereswill Dep. 62-63, 105-15 (As an Assistant Vice

President who worked on the project, Proux supervised his direct reports and the document

tracking project).

        At this stage, the Court does not engage in credibility determinations, but drawing all

factual inferences in favor of Proux that his supervision of Spiegel and others and of the

document tracking project was limited, the allegations still do not give rise to an inference of

discrimination.  The record remains undisputed that Proux occupied a supervisory role as

Assistant Vice President.  His disagreement with his employer's assessment that he was

---

[34]     Although Proux conceded in his deposition that he supervised four employees, Proux Dep. 61, he now
disputes the extent to which he supervised them.  *Compare* Defs. Proux 56.1 Stmt. ¶ 16 (Proux was expected to
directly supervise them) *with* Proux 56.1 Resp. ¶¶ 16-17 (supervision was limited to retrieving and tracking loan
documents from the Bank's vault); Proux Decl. ¶ 8 (same).

responsible in that supervisory role for the document tracking project does not support his claim

of discrimination. *Brown v. Soc'y for Seaman's Children*, 194 F. Supp. 2d 182, 191 (E.D.N.Y.

2002) ("[Discrimination claims] may not be used as a vehicle for second-guessing an employer's

business judgment.  The employer is permitted to make bad business judgments and misjudge

the work of employees as long as its evaluations and decisions are not made for prohibited

discriminatory reasons such as race or gender." (internal citation and quotation marks omitted)).

Moreover, Proux offers no evidence to substantiate his assertion that the ten other employees or

Spiegel were similarly situated so that any difference in their treatment would give rise to an

inference of racial or religious animus.  Even though the initial burden is minimal, Proux still has

not met it because a jury could not reasonably infer from these circumstances that Defendants

acted with a discriminatory intent based on Proux's race or religion.[35]

     In addition, as to Spiegel, the white Jewish employee to whom Proux compares himself,

Bereswill testified that she orally counseled Spiegel regarding his performance deficiencies and

told him that if his performance did not improve, she would give him a written warning.

Bereswill Dep. 60-66, 136-37.  She testified that his performance subsequently improved and,

therefore, additional write-ups were not necessary, and he earned a satisfactory evaluation and

bonus.  *Id.* 64.  Proux has proffered no evidence to refute Bereswill's explanation that Spiegel's

performance improved after counselling.  *Potash*, 972 F. Supp. 2d at 581 (finding that plaintiff's

efforts to compare herself to another employee must fail where plaintiff did not account for the

---

[35]    Regarding Proux's argument that he was not given the same resources as Healy, a white female, to
complete the document tracking project for which he was reprimanded, Pls. Opp'n at 16, there is no question of fact
that he was not similarly situated to Healy.  At the point in time about which he complains, he was reporting to
Healy, who was the Vice President of the department; Proux offers no evidence that he and Healy had the same job
responsibilities.

other employee's positive performance history).  Accordingly, there is no question of fact that Proux is not similarly situated to Spiegel.

Moreover, Proux's argument that he has established the existence of a "discriminatory atmosphere" simply does not fly.  Proux Opp'n at 15.  Proux's claim that IDBNY had a "discriminatory atmosphere" is based entirely on a single snippet of testimony by his co-plaintiff Newsome that Lisa Baum told Newsome that IDBNY is a "legacy bank."  *Id.* (citing Newsome Dep. 258:11-260:7).  This is relevant, apparently, because Baum allegedly told Bereswill that Proux had violated procedure by giving documents directly to the regulators, a criticism that showed up in Proux's 2011 Annual Performance Evaluation.  Bereswill Dep. 165-70; Bereswill Decl. Ex. F.[36]

Although the logical string is not entirely clear, Proux apparently asserts that because Baum believed IDBNY to be a "legacy bank," her criticism of him for violating IDBNY procedures evidences discriminatory intent.  But Newsome's testimony regarding Baum's statement is inadmissible hearsay to establish that the Bank was a "legacy bank," Fed. R. Evid. 802, and even if the statement were admissible, Proux has proposed no logical connection between IDBNY being a legacy bank (whatever exactly that means) and the workplace being infused with discriminatory intent.  The content of Baum's purported feedback regarding Proux's conduct was work-specific and devoid of discriminatory animus.  Although Proux asserts that Bereswill's criticism was "false" because he properly gave the information to the Bank's compliance department and not to regulators, Proux 56.1 Stmt. ¶¶ 163-64; Proux Decl. ¶ 17, Ex. D, he does not offer any evidence to support the inference that he wants the fact finder to draw,

---

[36]    Lisa Baum is, at best, a bit player in this case.  As to Proux, her only involvement was the criticism noted above that made its way into Proux's performance evaluation.  As to Newsome, her only involvement was allegedly telling him (the context of which is unknown) that he could not discipline an employee of IDBNY because IDBNY is a "legacy bank."

namely that Baum's criticism (factually correct or not) was motivated by discriminatory animus. *See Brown v. Soc'y for Seaman's Children*, 194 F. Supp. 2d at 191.

In sum, because Proux fails to offer any evidence of discrimination, circumstantial or direct, he fails to establish a *prima facie* case of racial or religious discrimination with respect to the Bank's treatment of him.[37]

### (b) Newsome

Newsome, like Proux, fails to establish a *prima facie* case of racial, religious, or gender discrimination with respect to the Bank's extension of his probation, the alleged harassment by Cooper, the Bank's evaluations of him, the alleged lack of mentorship opportunities, and the termination of his employment.[38]  He has simply presented no evidence upon which a reasonable trier of fact could infer that race, religion or gender were factors in the Defendants' decisions.[39]

---

[37]     The weakness of his religious discrimination claim—which rests entirely on his unsupported claim that the Bank preferred Jewish employees—is further undercut by the fact that neither Sweeney nor Bereswill is Jewish. Defs. Mem. at 18.  "'Courts draw an inference against discrimination where the person taking the adverse action is in the same protected class as the effected employee.'"  *Brooks v. Blank*, No. 10 CIV. 8124(ALC)(MHD), 2014 WL 1495774, at *12 (S.D.N.Y. Mar. 31, 2014) (quoting *Baguer v. Spanish Broad. Sys., Inc.*, No. 04 Civ. 8393(RJS), 2010 WL 2813632, at *11 (S.D.N.Y. July 12, 2010), *aff'd*, 423 F. App'x 102 (2d Cir. 2011)).  That Sweeney and Bereswill, the two individuals whom Proux maintains took adverse employment action against him, are not Jewish significantly undermines Proux's religious discrimination claim.

Proux's race and religious discrimination claims are also undermined by the fact that his replacement was an African-American Christian whose tenure at the Bank was successful. Defs. Mem. at 17.  This fact would not by itself defeat a *prima facie* showing, *Brown v. Henderson*, 257 F.3d at 252 ("discrimination against one employee cannot be cured, or disproven, solely by favorable, or equitable, treatment of other employees of the same race or sex."); *see also Phillips v. Chertoff*, No. 03 CIV. 4266(GEL), 2005 WL 3466033, at *5 (S.D.N.Y. Dec. 16, 2005), but it undermines an already weak (or non-existent) inference of discrimination, such as here.

[38]     Newsome fails to establish a *prima facie* case as to his claim that he was not promoted to a VP position because there is no evidence that Newsome even applied for a promotion and, even if he had, he would not have been eligible for a promotion while on probation.  Defs. Newsome 56.1 Stmt. ¶¶ 97-100; Newsome 56.1 Resp. ¶¶ 97-100.  Newsome also could not identify another Bank employee who was actually promoted to a Vice President position over him while he was employed at the Bank.  Defs. Newsome 56.1 Stmt. ¶ 98; Newsome 56.1 Resp.¶ 98.

[39]     As indicated in note 31 and accompanying text, *supra*, it is unclear what specific decisions Newsome argues are the adverse employment actions versus the actions that he claims raise an inference of discrimination. Again, because Newsome cannot demonstrate a *prima facie* case as to any of the actions, it is not necessary to determine the exact parameters of his claim.

To support an inference of discrimination, Newsome points to circumstances in which he asserts he was treated less favorably than other employees: he was reprimanded for taking a full lunch break and was required to stay later at work than his other co-workers; he was not given paid time off but a white female coworker was; he was not provided informal mentorship as was provided to Jewish employees; he could not discipline a white, Jewish employee; he was blamed for the Hotel Victor Closing when the delay was due to a white Jewish employee's misrepresentation; and Cooper called him "Mr. Big."  Pls. Opp'n at 16-18.[40]  None of the circumstances to which he points supports an inference of discrimination because Newsome relies predominantly on his own unsupported testimony to give an invidious cast to neutral work place events.  *Gorzynski*, 596 F.3d at 101 ("Even in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."); *Whethers v. Nassau Health Care Corp.*, 956 F. Supp. 2d 364, 379 (E.D.N.Y. 2013) ("'A plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn.'" (quoting *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005)), *aff'd*, 578 F. App'x 34 (2d Cir. 2014); *Gue v. Suleiman*, No. 10 CIV. 8958(RLE), 2012 WL 4473283, at *7 (S.D.N.Y. Sept. 27, 2012) ("[B]ald assertions without more are insufficient to overcome a motion for summary judgment.  Summary judgment is therefore appropriate where the only evidence in the case are the conclusory allegations of the plaintiff." (internal citations omitted)).  Moreover, Newsome fails to establish that the other employees to whom he wishes to be

---

[40]    Defendants argue in their opening brief that the extension of Plaintiff's probationary period, the lack of signing authority, and Plaintiff's eligibility for a Vice President position are not circumstances from which a jury could conclude that Defendants acted with discriminatory intent.  Defs. Newsome Mem. at 12-13.  Newsome does not challenge those arguments in his opposition.  Accordingly, those claims have been abandoned.  *Jackson v. Fed. Express*, 766 F.3d at 195-96, 198

compared are sufficiently similarly situated to him "to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *McGuinness*, 263 F.3d at 54.

First, Newsome fails to offer any evidence to support his claim that his treatment vis-à-vis his lunch break or his departure time supports an inference of discrimination. Newsome asserts that Cooper did not allow him to take a full hour lunch break and reprimanded him for going to the gym during lunch. Newsome Opp'n at 16 (citing Newsome Dep. 116:13-22). He argues this was discriminatory because other bank employees, namely Wanda Guzman and Eileen Healy, were permitted to go to the gym during their lunch break. Newsome Opp'n at 16 & n.6. This claim is fatally undercut by the record, however, which shows that Newsome was, in fact, allowed to take one hour lunch breaks and actually attended spin classes on a regular basis. Newsome Opp'n at 16; Defs. Newsome Reply at 4, n.3.

Moreover, Plaintiff has presented no evidence that Guzman or Healy was sufficiently similarly situated to Plaintiff to permit a reasonable finder of fact to conclude that any differential treatment was due to racial-, religious-, or gender-based animus. Indeed, the record affirmatively reflects that Guzman and Newsome were not similarly situated—Guzman was an administrative assistant whereas Newsome was an Assistant Vice President; the two employees did not have the same job responsibilities, and the Bank had different expectations of them. Guzman Dep. (Dkt. 63-10) at 12. Regarding Healy, Newsome argues "[a] better comparator for purposes of race and gender discrimination [than Healy] would be hard to find" because Healy was Newsome's predecessor in the department. Newsome Opp'n at 16 n.6. But Newsome's argument ignores the fact that Healy was a Vice President and was transitioning to a different department by the time Newsome joined the Bank and was therefore not at the same level or, after the first few months, even in the same department as Newsome. In addition, the record reflects that Newsome did not know and was only speculating whether, when Healy was in the

33

CRE, she completed her work commitments before attending spin class.  Defs. Newsome 56.1 Stmt. ¶ 89 (citing Newsome Dep. 224-32, 243); *see also* Healy Dep. 49-50 (testifying that she would not go to spin class if work needed to be completed).  Therefore, Newsome has not presented evidence upon which a rational trier of fact could reasonably conclude that any alleged differential treatment of Healy or Guzman was due to racial, religious, or gender animus as opposed to differences in job responsibilities, expectations, and performance.

Newsome also claims that he was required to stay at work later than his co-workers. Newsome Opp'n at 16 (citing Newsome Dep. 119:3-121:9, 205:6-14).  This assertion, which is supported only by his own testimony, is insufficient to give rise to an inference of discrimination.  Newsome admitted that his work occasionally required him to stay later than 5:00 p.m. and that he did not know and was speculating whether his co-workers had similar work commitments or whether they completed their work before 5:00 p.m.  Newsome Dep. 119-120, 223-32.  Moreover, he has not specifically identified in his opposition any co-workers who were arguably similarly situated who were allowed to leave work earlier than he.[41]

Newsome argues that Defendants discriminated against him by denying him paid time off while granting time off to Elena Dokianos, a white female.  Newsome Opp'n at 17.  The record does not support Newsome's argument that he was denied time off or that he was treated differently than Dokianos.  Dokianos was granted additional time off to care for an ill father. Newsome Decl. Ex. E.  Although Mr. Cooper may have initially denied Newsome his requested time off to care for his sick brother, Newsome concedes that Defendants granted him time off. Newsome Dep. 89-90.  Even assuming that the initial denial followed by a subsequent grant of permission to take time off constitutes differential treatment, Newsome has presented no

---

[41]    Newsome asserts that Fried left work at 5:00 p.m., but Fried was Newsome's supervisor and, accordingly, was not similarly situated to Newsome.

evidence to support his assertion that Dokianos was sufficiently similarly situated to support his claim that the different treatment was due to discriminatory animus.

Newsome argues that the bank granted informal mentorships to Jewish employees, David I. Cohen and Jeff Marcus, but not to him.  Newsome Opp'n at 17.  There is no evidence that IDBNY maintains a formal mentorship program.  *See* Greene Reply Newsome Decl. ¶¶ 10-11; Fried Decl. ¶¶ 45-46.  Newsome testified that Cohen told him he was being mentored, and Newsome observed opportunities being afforded to Cohen and Marcus that supported his belief that they were being mentored.  Newsome Dep. 97-108.  But Newsome's testimony about Cohen's statement is inadmissible hearsay to establish that Cohen was, in fact, being mentored. Fed. R. Evidence 802.  More problematic for Newsome, he admitted that he was given opportunities similar to those afforded to Marcus and Cohen.  *See* Newsome Dep. 103-08. Moreover, Newsome sets forth no facts to show that Cohen and Marcus were similarly situated to support his claim that any different treatment occurred because of race or religion.  To the contrary, Newsome testified that Cohen was junior to him, did not have the same responsibilities, and was, in fact, supervised by Newsome.  Newsome Dep. 258-60.  Similarly, Newsome testified that Marcus was a loan officer, which Newsome conceded is a different position with different job responsibilities than Newsome's position as a loan administrator.  Newsome Dep. 222-23.

Newsome further argues that the Bank treated its Jewish employees differently with respect to discipline, pointing only to the fact that he was unable to write-up Cohen for lateness and to Baum's comment regarding IDBNY being a "legacy bank."  Newsome Opp'n at 17. Baum's statements are inadmissible hearsay, and the meaning of "legacy bank" is unknown.  As with Proux, the logical connection between Newsome's allegations and his own discrimination

claims are unclear because Newsome has not claimed that he was disciplined under circumstances for which he was prevented from disciplining Cohen.[42]

Finally, Newsome argues that his allegation that Cooper called him "Mr. Big" or "Big" supports "a classic, and lewd, stereotype of African Americans and can support an inference of discrimination."  Newsome Opp'n at 18.  First, neither Newsome's testimony regarding these allegations, Newsome Dep. 138-163, 288,[43] nor the arguments in his opposition offer any evidence whatsoever to support his claim that "Mr. Big" is evidence of racial animus based on stereotypes about African American men.  In addition, for these allegations, Newsome relies solely on his own testimony, and his testimony is contradictory and inconsistent regarding the alleged comments.  *Compare* Newsome Dep. 152:20-153:20 (testifying there were three specific instances of Cooper calling him Mr. Big in 2011 and none in 2012) *with* Newsome Dep. 287:13-296:24 (testifying, after reviewing the Amended Complaint at his attorney's direction, that a separate occasion had occurred in January 2012 and, instead of three instances, the comments occurred on a weekly basis).  *See also* Stoler Newsome Decl. Ex. Q (Newsome's EEOC Complaint, which does not raise these allegations); Greene Newsome Decl. Ex. G, at 1 (March 5, 2012 Letter from Newsome's attorney, which lays out specific instances of alleged racial

---

[42]    Newsome argues that his position on differential discipline of Jewish employees is "corroborated" by Wanda Guzman, an Hispanic female, who testified that Cooper would discipline her for talking on the phone at work but would not discipline Cohen.  Newsome Opp'n at 17 (citing Guzman Dep. 33:25-34:24).  Newsome also points to the Hotel Victor Closing, arguing that he was blamed for the delay when it was really the fault of Marcus.  Newsome Opp'n at 18.  These arguments fail because, again, Plaintiff fails to offer any evidence that these employees were sufficiently similarly situated to permit a reasonable inference that any alleged difference in treatment was attributable to discrimination.  Moreover, even if the Bank misjudged who was responsible for the problems with the closing, a discrimination claim cannot be used to second-guess that judgment.  *Brown v. Soc'y for Seaman's Children*, 194 F. Supp. 2d at 191.

[43]    When asked during his deposition how the comment supported or related to his race discrimination claim, Newsome first answered "Mr. Cooper did not know that I was a Black man . . . he thought I was a Hispanic man . . . ." and did not realize.  Newsome Dep. 144:18-145:4, 146:9-148:15.  When pressed further, he stated "I don't know how it relates – I don't know how it relates to my race, but it was discriminating . . . It was an inappropriate advance to me," *id.* 145:15-25, and "[t]hat's how I feel. That's what I perceived," *id.* 157:17-158:4.

discrimination but does not mention these allegations); Stoler Newsome Decl. Exs. M-N

(Newsome made similar allegations against a colleague at Emigrant).

As a general rule, a district court may not discredit a witness's deposition testimony on a

motion for summary judgment, but this rule is not absolute. *Fincher*, 604 F.3d at 725-26. When

a plaintiff relies solely on his own testimony and the testimony is so contradictory and

implausible that overwhelming doubt is cast upon its credibility, the court may dispose of some

improbable allegations and dismiss the claim. *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460,

470-71 (S.D.N.Y. 1998) (Sotomayor, J.); *see also Rojas v. Roman Catholic Diocese of*

*Rochester*, 660 F.3d 98, 104-05 (2d Cir. 2011) ("Although a district court generally should not

weigh evidence or assess the credibility of witnesses, . . . in the rare circumstance where the

plaintiff relies almost exclusively on his own testimony, much of which is contradictory and

incomplete, it will be impossible for a district court to determine whether the jury could

reasonably find for the plaintiff, and thus whether there are any genuine issues of material fact,

without making some assessment of the plaintiff's account." (citation, alterations, and internal

quotation marks omitted)). Given the fundamental contradictions and inconsistencies in

Newsome's testimony, as well as his history of levelling this particular allegation against a

different male colleague at a different bank, Stoler Decl. Exs. M, N; Newsome 56.1 Resp. ¶ 59,

no rational fact finder would credit this allegation to find a discriminatory intent.

Finally, the entirety of Newsome's already weak claims is further undermined by the

"same actor" inference. Defs. Newsome Mem. at 12. "[W]hen the person who made the

decision to fire was the same person who made the decision to hire, it is difficult to impute to

[him] an invidious motivation that would be inconsistent with the decision to hire." *Grady v.*

*Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997); *see also Dellaporte v. City Univ. of New*

*York*, 998 F. Supp. 2d 214, 227 (S.D.N.Y. 2014) ("[W]here, as here, the same person was

involved in the hiring and firing of a plaintiff, the presumption against racial bias is difficult to overcome."); *Baity*, 51 F. Supp. 3d at 448 ("'The decision-makers in the hiring and firing need not mirror each other exactly as long as one management-level employee played a substantial role in both decisions.'" (quoting *Campbell v. Alliance Nat'l Inc.*, 107 F. Supp. 2d 234, 250 (S.D.N.Y. 2000)).  Because Fried played a substantial role in hiring and firing Newsome, there is a presumption against racial bias in Fried's discipline of Newsome in January 2012 and Newsome's discharge in March 2012.

Newsome argues that "the same actor defense does not apply, because [his] termination was actually carried out by Marc Cooper, not Herb Fried," and Newsome was directly supervised by Cooper, not Fried.  Newsome Opp'n at 15.  But the undisputed evidence does not support Newsome's argument.  First, the record is clear that *both* Fried and Cooper participated in the January 2012 meeting to extend Newsome's probation, and both signed his Evaluation and Written Notice.  Fried Decl. Ex. D; Defs. Newsome 56.1 Stmt. ¶ 62; Newsome 56.1 Resp. ¶ 62. Moreover, Newsome's assertion that Fried was substantively uninvolved in his performance review and that Cooper took the reins is supported only by his own conclusory allegations and is undermined by his admission that he recalled discussing with Fried, not Cooper, the problems with the Hotel Victor Closing (a significant element in his January 2012 Evaluation).  Newsome Dep. 184-85.  Moreover, Fried and Cooper were both involved in hiring Newsome, inasmuch as both interviewed Newsome for the position.  Defs. Newsome 56.1 Stmt. ¶¶ 21-22; Newsome 56.1 Resp. ¶¶ 21-22.  Accordingly, whether Cooper or Fried took the lead in Newsome's discipline or termination, the same actor inference applies to both.

In sum, because Newsome fails to offer any evidence upon which a rational juror could infer unlawful discrimination and because his claims are significantly undermined by the "same

actor" inference, he has not established a *prima facie* case of racial, religious, or gender

discrimination.

### B.   Neither Proux nor Newsome has established that Defendants' proffered reasons for its actions are pretext for discrimination

Assuming *arguendo* that Plaintiffs' allegations survive the first step in the *McDonnell*

*Douglas* framework, neither has rebutted the Defendants' proffered non-discriminatory reasons

for the adverse actions taken against them.

> [O]nce the employer presents evidence of its justification for the adverse action,
> . . . the presumption drops out of the picture and the *McDonnell Douglas*
> framework is no longer relevant.  At this point, in the second phase of the case,
> the plaintiff must demonstrate that the proffered reason was not the true reason (or
> in any event not the sole reason) for the employment decision, which merges with
> the plaintiff's ultimate burden of showing that the defendant intentionally
> discriminated against her.

*Littlejohn*, 795 F.3d at 307-08 (internal quotation marks and citations omitted).  "If the employer

articulates [a legitimate, nondiscriminatory] reason for its actions, the burden shifts back to the

plaintiff to prove that the employer's reason 'was in fact pretext' for discrimination."  *Vega v.*

*Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015).  At this point, the plaintiff

must prove "'that discrimination was the real reason for the employment action.'"  *Id.* (quoting

*Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000)).  Plaintiffs have simply not

adduced evidence from which a jury could reasonably conclude that the Bank's explanations for

its actions are pretextual.

Regarding Proux, Defendants have offered an overwhelming amount of evidence that the

decisions to transfer Proux, to give him unsatisfactory evaluations and write-ups, and ultimately

to terminate his employment were based on legitimate, non-discriminatory reasons relating to his

performance.  Regarding Proux's transfer, Sweeney testified that she requested Proux because

she believed he had the skills required for the position and thought it would give him a good

opportunity to be seen and get exposure to other areas of the Bank.  Sweeney Dep. 57-58.

Bereswill's memorandum to Human Resources supports that rationale.  Bereswill Decl. Ex. A.

Regarding Proux's performance, the record reflects that, after he returned to the Credit

Administration Division at his request after a blow-up with Sweeney, Bereswill and Human

Resources met with Proux multiple times to discuss his performance deficiencies and to provide

feedback and counseling.  Bereswill gave him a Verbal Warning in November 2011, Bereswill

Decl. ¶¶ 18-21, Ex. C; Proux Decl. ¶¶ 11-14, and Human Resources met with him that same day,

Stoler Proux Decl. Ex. O.  Proux subsequently received two Written Warnings and

corresponding PIPs in early December 2011 and in late January 2012, respectively.  Bereswill

Decl. Exs. D-E.  These Written Warnings reflected continuing performance deficiencies.  The

PIPs set forth specific requirements for him to improve his performance and cautioned that if he

did not meet the requirements, he might be terminated.  *Id.*  His Annual Performance Evaluation

reflected consistently deficient performance, Bereswill Decl. Ex. F, leading to his termination.

Similarly, Defendants have offered an overwhelming amount of evidence that the Bank's

decision to extend Newsome's probation, give him a Written Notice, and ultimately terminate

him were based on legitimate, non-discriminatory reasons related to his performance.  When

Fried and Cooper extended Newsome's probation in mid-January 2012, they provided him with

an Employee Evaluation Report and a Written Notice that explained his performance

shortcomings and provided feedback so that he could improve.  *See* Defs. Newsome 56.1 Stmt.

¶ 62; Newsome 56.1 Resp. ¶ 62; Fried Decl. Ex. D.  The Written Notice gave Newsome sixty

days to show improvement.  Fried Decl. Ex. D.  The record reflects that Newsome was

terminated after the close of those sixty days, based on Defendants' conclusion that his

performance had not improved.  Fried Decl. Ex. E.

Given the Defendants' showing of legitimate, non-discriminatory reasons for the actions taken against the Plaintiffs, the burden shifts back to the Plaintiffs to demonstrate that the Bank's reasons were in fact pretext for discrimination.  Although both Proux and Newsome recognize that they must come forward with evidence that disproves the employer's reason for taking an adverse action *and* evidence that proves discrimination as the real reason for the employment decision, they argue that "a plaintiff may prove both facts through circumstantial evidence, including by demonstrating the falsity of the employer's proffered reason."  Proux Opp'n at 18 (citing *Reeves*, 530 U.S. at 137); Newsome Opp'n at 18 (same).  In *Reeves*, the Supreme Court held that:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. . . . In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.

530 U.S. at 147; *see also Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 74 (2d Cir. 2015).  But the Supreme Court also recognized that "[c]ertainly, there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory."  *Reeves*, 530 U.S. at 148.

Assuming *arguendo* that Proux and Newsome have established a *prima facie* case of discrimination, no rational fact finder could conclude from Plaintiffs' showing that the reasons given by Defendants are pretextual.  To support his argument that Defendants' complaints about the quality of his work were false, Proux asserts, implausibly and *ipse dixit*, that his poor performance reviews were fabricated, that Sweeney "sabotaged" his performance by providing him incorrect information from which to prepare reports, and that Sweeney and Bereswill were conspiring against him in retaliation for his and others' complaints to Human Resources about

Sweeney. Defs. Proux 56.1 Stmt. ¶ 87; Proux 56.1 Resp. ¶ 87; Proux Dep. 126:20-130:5, 209:5-13.  Proux advances no admissible evidence to support any of these allegations, however. Contrary to Proux's arguments, Proux Opp'n at 18-20, there is simply no evidence in the record from which a reasonable juror could conclude that Defendants' assessment that he was a poor performer was false or that Bereswill and Sweeney conspired to terminate him for discriminatory reasons couched as performance deficiencies.

Newsome points to the following evidence to support his contention that the Defendants falsely accused him of being a poor performer: an unexplained delay in extending his probationary period; his disagreement with Defendants' conclusion that he was the cause of delay of the Hotel Victor Loan Closing; Healy's opinion that Newsome's performance was satisfactory; Newsome's personnel folder was empty in November 2011; and the Bank was unable to substantiate specific examples of poor performance.  Newsome Opp'n at 19-20. Newsome argues that these facts could lead "[a] reasonable fact finder [to] determine that defendants' rationale of poor performance is false."  *Id.* at 20.  Aside from the fact that Newsome's personnel file was empty in November 2011, Newsome has no admissible evidence to support any of his other arguments.

Beyond the fact that there is no admissible evidence to support either Plaintiff's claims, their arguments fail to meet the Plaintiffs' ultimate burden to establish that the Bank's reasons for taking adverse action were pretext for discrimination.  At their heart, Plaintiffs' claims reflect their disagreement with the Defendants' business judgments and assessments of the quality of their work or reflect the Plaintiffs' subjective feelings and perceptions that they were being discriminated against because of their race, religion, ethnicity or gender.  Such claims are, however, insufficient to establish discrimination.  *See Ya-Chen Chen*, 805 F.3d at 74-75 (finding that *Reeves* permitted the factfinder to consider the defendant's dishonesty, but plaintiff's

testimony revealed nothing more than difference of opinion and "a plaintiff's feelings and perceptions of being discriminated against do not provide a basis on which a reasonable jury can ground a verdict" (internal quotation marks and citation omitted)); *Dorcely v. Wyandanch Union Free Sch. Dist.*, 665 F. Supp. 2d 178, 193 (E.D.N.Y. 2009) ("It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are nondiscriminatory."); *Brown v. Soc'y for Seaman's Children*, 194 F. Supp. 2d at 191 ("[Discrimination claims] may not be used as a vehicle for second-guessing an employer's business judgment." (internal citation and quotation marks omitted)); *Ricks v. Conde Nast Publ'ns, Inc.*, 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000) ("The mere fact that an employee disagrees with h[is] employer's assessments of h[is] work . . . cannot standing on its own show that h[is] employer's asserted reason for termination was pretextual."), *aff'd*, 6 F. App'x 74 (2d Cir. 2001).

Because Plaintiffs have not established a *prima facie* case of discrimination and have not met their burden to present admissible evidence from which a rational jury could conclude that the legitimate, non-discriminatory reasons Defendants have offered were pretext for discrimination, their race/color/ethnicity, religion, and gender discrimination claims under Title VII, Section 1981, and NYSHRL are dismissed.[44]

---

[44] Having dismissed Plaintiffs' race/color/ethnicity, religion, and gender discrimination claims under Title VII, Section 1981, and NYSHRL, the Court declines to exercise supplemental jurisdiction over the Plaintiffs' NYCHRL claims. Accordingly, the Plaintiffs' race/color/ethnicity, religion, and gender discrimination claims under the NYCHRL are also dismissed without prejudice. *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 411 (2d Cir. 2015) ("Of course, a federal court need not undertake such a review of a NYCHRL claim if, after disposition of the parallel federal claim, it declines to exercise pendent jurisdiction."); *Johnson v. IAC/Interactive Corp.*, 2 F. Supp. 3d 504, 518 (S.D.N.Y. 2014) ("Having granted summary judgment and dismissed all of the claims for which there exists federal-question jurisdiction, it is within the Court's discretion to exercise supplemental jurisdiction over plaintiff's remaining municipal law claims.").

**III.    Proux and Newsome Have Not Established a *Prima Facie* Case of a Hostile Work Environment.**

Under Title VII, Section 1981, and the NYSHRL, "[a] hostile work environment claim requires a showing [1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)); *see also Littlejohn,* 795 F.3d at 320-21.  The test for a hostile work environment "has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive."  *Alfano*, 294 F.3d at 373 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also Littlejohn,* 795 F.3d at 320-21.  "Title VII 'does not set forth a general civility code for the American workplace.'" *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (internal quotation marks and citation omitted) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Proux's hostile work environment claims are based on his allegations that Sweeney called him derogatory names with greater frequency than she used such terms relative to other employees and that she tried to sabotage his work performance.  Proux Opp'n at 21.  Adding all of those claims together, they simply do not add up to a hostile work environment, let alone a racially hostile environment.

Newsome's claims are based on his allegations that Cooper made lewd sexual remarks to him.  Newsome Opp'n at 21.  As noted above, these allegations are simply implausible.  *See infra* at 36-37.  But even if they are accepted as true, these comments were occasional, at worst. Newsome Dep. 287:13-296:24.

Both Proux's and Newsome's allegations fall well short of the severity and pervasiveness required for a *prima facie* case of hostile work environment.  *See, e.g.*, *Daniel v. T&M Prot. Res. LLC*, 87 F. Supp. 3d 621, 634-39 (S.D.N.Y. 2015) (collecting cases); *see also Lewis v. City of Buffalo Police Dep't*, 311 F. App'x 417, 421-22 (2d Cir. 2009) (summary order) (where evidence showed, at most, that supervisor occasionally referred to her by vulgar or derogatory names, such conduct was unprofessional but does not support a finding of hostile work environment).

 "[I]t is 'axiomatic' that in order to establish a . . . hostile work environment . . . a plaintiff must demonstrate that the conduct occurred because of [his protected class]." *Alfano*, 294 F.3d at 374 (quoting *Brown v. Henderson*, 257 F.3d at 252).  As discussed above, regardless of the frequency of such events, Proux and Newsome have adduced no evidence, other than their own conclusory allegations and speculation, to show that the hostility to which they were purportedly subjected was "because of [their] membership in a protected class." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).  Accordingly, their claims of hostile work environment are dismissed.[45]

## IV. Neither Proux Nor Newsome Has Established a Claim for Unlawful Retaliation

 Plaintiffs also allege retaliation under Title VII, Section 1981, the NYSHRL, and the NYCHRL.  Courts evaluate retaliation claims under Title VII, Section 1981, and the NYSHRL under a "three-step burden-shifting analysis." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *see also Littlejohn*, 795 F.3d at 315-16.  First, the plaintiff must make out a *prima facie* case of retaliation. *Hicks*, 593 F.3d at 164.  If he succeeds, the defendants "must then 'articulate a legitimate, non-retaliatory reason'" for the materially adverse action. *Id.* (quoting *Jute v.*

---

[45] Having dismissed Plaintiffs' hostile work environment claims under Title VII, Section 1981, and NYSHRL, the Court declines to exercise supplemental jurisdiction over Plaintiffs' NYCHRL claims and dismisses those claims without prejudice. *Velazco*, 778 F.3d at 411.

*Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).  Finally, the plaintiff must prove

"that 'a retaliatory motive played a part'" in the adverse action.  *Id.* (quoting *Sumner v. U.S.*

*Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).

To make out a *prima facie* case, a plaintiff "must demonstrate that '(1) [he] engaged in

protected activity; (2) the employer was aware of that activity; (3) the employee suffered a

materially adverse action; and (4) there was a causal connection between the protected activity

and that adverse action.'" *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716

F.3d 10, 14 (2d Cir. 2013) (*per curiam*) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d

Cir. 2012)); *see also Littlejohn*, 795 F.3d at 316.  The parties dispute whether Proux and

Newsome can establish the first and fourth elements of a *prima facie* case—that they engaged in

protected activity and that there was a causal connection between any protected activity and the

materially adverse action.[46]

Regarding the first element, "[t]he term 'protected activity' refers to action taken to

protest or oppose statutorily prohibited discrimination, and may take the form of either formal or

informal complaints." *Guzman v. City of New York*, 93 F. Supp. 3d 248, 261 (S.D.N.Y. 2015)

(internal quotation marks and citation omitted).  "An employee's complaint may qualify as

protected activity . . . 'so long as the employee has a good faith, reasonable belief that the

underlying challenged actions of the employer violated the law.'" *Kelly*, 716 F.3d at 14 (quoting

---

[46]     Once again, it is not entirely clear what the Plaintiffs assert were the materially adverse actions.  Similar to
their discrimination claims, Plaintiffs' Amended Complaint asserts that Defendants retaliated against Plaintiffs by:

> [harassing Mr. Newsome with comments related to his genitalia;] giving Plaintiffs questionable
> discriminatory write-ups; refusing to promote Mr. Newsome to a VP position; refusing to provide
> Plaintiffs professional mentorship and/or opportunities that other White employees and/or
> employees of Jewish religion/heritage received; transferring Mr. Proux out of his department;
> isolating Mr. Proux from other employees; and terminating Plaintiffs' employment.

Am. Compl. ¶¶ 473, 505, 530, 552, 579, 603, 628, 657, 683.  And similar to their discrimination claims, it is not
necessary to resolve with precision the materially adverse actions on which Plaintiffs rely because Plaintiffs cannot
demonstrate a *prima facie* case of retaliation as to any of the above.

*Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001)).  "'The reasonableness of the plaintiff's

belief is to be assessed in light of the totality of the circumstances.'"  *Kelly*, 716 F.3d at 14-15

(quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).

> Regarding the fourth element:

> A causal connection in retaliation claims can be shown either '(1) indirectly, by
> showing that the protected activity was followed closely by discriminatory
> treatment, or through other circumstantial evidence such as disparate treatment of
> fellow employees who engaged in similar conduct; or (2) directly, through
> evidence of retaliatory animus directed against the plaintiff by the defendant.'

*Littlejohn*, 795 F.3d at 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.

2000)).  Temporal proximity must be "very close," *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S.

268, 273-74 (2001) (*per curiam*), but there is no "'bright line to define the outer limits beyond

which a temporal relationship is too attenuated to establish a causal relationship between the

exercise of a federal constitutional right and an allegedly retaliatory action,'" *Abrams*, 764 F.3d

at 254 (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty.*, 252 F.3d 545,

554 (2d Cir. 2001)).

Proux claims that he engaged in protected activity by making multiple complaints

concerning his mistreatment, specifically: "three complaints to [Human Resources] in or around

June of 2011, Proux Dep. 117:17-120:8[;] complaints to David Cohen, . . . and [Human

Resources], on or about November 1, 2011[,] Proux Dep. 87:8-94:15, 96:6-97:21, Proux Decl.

Exh. E[;] and a meeting with in house counsel later that month[,] Proux Dep. 103:21-104:7;" and

his attorney's letter on February 6, 2012.  Proux Opp'n at 23.

Proux's June 2011 and November 2011 complaints cannot constitute protected activity

because they addressed mistreatment, not racial or religious discrimination.  Although Proux is

correct that he can prevail on a retaliation claim even when the underlying conduct complained

of was not, in fact, unlawful, Proux Opp'n at 23-24 (citing *Manoharan v. Columbia Univ. Coll.*

*of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)), Plaintiff must still establish that he

possessed a good faith, reasonable belief that the employer's underlying actions violated the law

and that legal violation was what he complained about.  *Kelly*, 716 F.3d at 14-15.  To establish

that his June 2011 and November 2011 complaints were protected activity, Proux cites testimony

that he complained about "discrimination" in the form of Sweeney calling him names.  Proux

Opp'n at 23 (citing Proux Dep. 87:8-94:15, 96:6-97:21, 103:21-104:7, 117:17-120:8).  None of

the cited passages proves that he complained about racial-, or religious-discrimination, as

opposed to complaining about an allegedly abusive manager.  General allegations of

mistreatment do not constitute protected activity.  *Drumm v. SUNY Geneseo Coll.*, 486 F. App'x.

912, 914 (2d Cir. 2012) (summary order) ("[P]laintiff's allegations that her supervisor 'berated'

her and made other harsh comments . . . amount only to general allegations of mistreatment, and

do not support an inference that plaintiff had a reasonable good faith belief that she was subject

to gender discrimination."); *see also Kelly*, 716 F.3d at 15-16 (finding that "[a]lthough [plaintiff]

allege[d] that she repeatedly used the words 'discrimination' and 'harassment' when

complaining to her employers," there was nothing in her complaint to support her claim that her

gender played a substantial role in her employer's behavior); *Plahutnik v. Daikin Am., Inc.*, 912

F. Supp. 2d 96, 108 (S.D.N.Y. 2012) ("Plaintiff does not assert that the complaints were

specifically of discrimination—as opposed to general allegations of mistreatment, which are not

protected under Title VII, let alone that his complaints were specific enough such that his

employer understood, or could reasonably have understood that they were directed at

discrimination on the basis of race or national origin." (internal quotation marks and citations

omitted)).  Moreover, the fact that Proux acknowledges that he encouraged others of diverse

racial, religious and gender demographics to complain to Human Resources about Sweeney in

June 2011 undermines the notion that he reasonably believed that Sweeney's mistreatment of

him constituted unlawful racial-, religious-, or gender- based discrimination.  Defs. Proux 56.1
Stmt. ¶ 26; Proux 56.1 Resp. ¶ 26.

Although Proux's attorney's letter to the Bank does constitute protected activity, it cannot
support a retaliation claim.  Given the gradual progression of poor performance feedback
received by Proux, no rational factfinder could find a causal connection between the protected
activity in February 2012 and the materially adverse employment action that followed.  By the
time Proux's attorney sent the letter, Proux had already received multiple warnings, beginning
with the Verbal Warning on November 22, 2011, been placed on two PIPs, received a poor
performance review, and been advised that his employment could be terminated at the end of the
February.  *Slattery*, 248 F.3d at 95 ("Where timing is the only basis for a claim of retaliation, and
gradual adverse job actions began well before the plaintiff had ever engaged in any protected
activity, an inference of retaliation does not arise.").  Because Proux fails to establish a causal
connection between the protected activity and any adverse action, he has not established a *prima
facie* case of retaliation.

Newsome claims he engaged in protected activity when he complained about being
discriminated against to both Fried in November 2011 and Human Resources in December 2011.
Newsome Opp'n at 23 (citing Newsome Dep. 111:20-112:5, 115:10-20, 133:8-133:22).
Newsome claims he was retaliated against subsequent to those complaints, when he was placed
on extended probation in January 2012, two months after the probationary period was supposed
to have ended.  *Id.*  The record does not support Newsome's assertion that he complained of
race-, religion-, or gender-discrimination to Fried or Human Resources in November or
December 2011.  Although Newsome testified that he complained to Fried and Human
Resources about being treated differently and that he used the word "discrimination," Newsome
Dep. 111:20-112:5, 115:10-22, 133:8-137:23, the record is devoid of any evidence that he held a

good faith reasonable belief that the treatment of which he complained violated the law, or that

he actually complained of unlawful race-, religion-, or gender-discrimination, as opposed to

complaining generally of being treated unfairly by his supervisor.  *Kelly*, 716 F.3d at 14-16.

Newsome's lawyer's letter to the Bank dated March 5, 2012, cannot serve as the

protected activity on which to base a retaliation claim.  Plaintiff was terminated on March 19,

2012.  Defs. Newsome 56.1 Stmt. ¶ 80; Newsome 56.1 Resp. ¶ 80.  As with Proux, "[w]here

timing is the only basis for a claim of retaliation, and gradual adverse job actions began well

before the plaintiff had ever engaged in any protected activity, an inference of retaliation does

not arise."  *Slattery*, 248 F.3d at 95.  Newsome had already received negative performance

evaluations before the Bank received the March 5, 2012 letter—his probation had already been

extended in January 2012, and he had already received a negative evaluation and Written

Warning, stating that he could be terminated in mid-March if his performance did not improve.

Given the progression of poor feedback prior to any protected activity, no inference of retaliation

can arise from the timing of these events.  Because Newsome has failed to establish a causal

connection between his protected activity and a materially adverse action, he has failed to

establish a *prima facie* case of retaliation.

In sum, because Plaintiffs fail to establish a *prima facie* case of retaliation, their Title VII,

Section 1981, and NYSHRL race, religion, and gender retaliation claims are dismissed.[47]

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment are GRANTED

as to all of Plaintiffs' causes of action except those based on the NYCHRL, which are dismissed

---

[47]     Having dismissed Plaintiffs' retaliation claims under Title VII, Section 1981, and NYSHRL, the Court
declines to exercise supplemental jurisdiction over Plaintiffs' NYCHRL claims and dismisses those claims without
prejudice.  *Velazco*, 778 F.3d at 411.

without prejudice.  The Clerk of the Court is respectfully directed to terminate Dkts. 54 and 60

and to close the case.


**SO ORDERED.**

**Date:  March 28, 2016**
**        New York, NY**

_____

**VALERIE CAPRONI**
**United States District Judge**